WILLIAM RYAN, complainant-appellant,

*v.*

MOTOR CREDIT Co., INC., and GENERAL ACCEPTANCE CORPORATION, corporations, defendants-respondents.

[Argued May term, 1942. Decided September 18th, 1942.]

*Messrs. Fast & Fast (Mr. Israel B. Greene,* of counsel), for the complainant-appellant.

*Mr. Charles Blume (Mr. James D. Carpenter, Jr.,* of counsel), for the defendants-respondents.

The opinion of the court was delivered by

PORTER, J.

This is an appeal from an order advised by Vice-Chancellor Berry dismissing the bill and counter-suit on the ground that the parties were guilty of illegal transactions under the provisions of the Small Loan Statute, *chapter 62, P. L. 1932* (now *R. S. 17:10-1* to *26*) and therefore neither was entitled to equitable relief because both had unclean hands. We are in accord with the conclusions of the Vice-Chancellor.

Ryan, the complainant, was engaged in buying and selling automobiles. He dealt with Motor Credit Co., defendant (hereinafter called Loan Co.), in buying and selling its repossessed automobiles. He financed his business by borrowing funds from the Loan Co., defendant, which was a subsidiary of General Acceptance Corporation, defendant. During a period of about three years complainant borrowed about $75,000 on nearly 500 automobiles on which he gave chattel mortgages. These loans were made under the pro-

visions of the Small Loan Law. This statute authorized licensed lenders under the supervision of the Commissioner of Banking and Insurance to make loans up to $300 at a rate of interest not exceeding $2\frac{1}{2}$ per centum per month. Severe penalties are provided for violations of the act and illegal loans are made null and void and the borrower is entitled to recover from the lender all sums paid or returned to the lender. These loans were made under the said statute and complainant paid interest thereon at the rate of $2\frac{1}{2}$ per centum per month. The statute (section 13) provides that loans shall not exceed the sum of $300. The complainant obtained these loans in the names of fictitious persons in order to split up the loans into sums of $300 or less. He was the actual borrower, however, and was so considered and dealt with by Loan Co. There came a time when the defendants decided to discontinue these loans. At that time Ryan owed Loan Co. $28,919.85 and defendants demanded and received from Ryan a note to General Acceptance Corp. for that sum carrying interest at 6 per centum secured by a chattel mortgage on automobiles in his possession and a guarantee agreement against loss by foreclosure. Ryan reduced this indebtedness to $17,500 by September, 1937, and then refused to liquidate further and made an offer which was refused to pay the sum of $2,300 in settlement. Of course, as the Vice-Chancellor said the vice inherent in the original loans followed and attached to all substituted obligations, securities or agreements. *Boyd* v. *Engelbrecht, 36 N. J. Eq. 612; Kobrin* v. *Hull, 96 N. J. Eq. 41; Berk* v. *Isquith Productions, Inc., 98 N. J. Eq. 608.* The instant suit was then filed in which he prayed that the note, chattel mortgage and guarantee agreement be surrendered and canceled and that General Acceptance Corp. be enjoined from prosecuting an action for replevin of the automobiles which it had brought in the Supreme Court and further, that defendants be decreed to account and return to Ryan all sums which had been paid to them as interest or principal. Respondents filed a counter-claim praying that the bond given by General Acceptance Corp. in the replevin suit be canceled and that

Ryan be decreed to pay General Acceptance Corp. the balance due on the note, chattel mortgage and guarantee agreement.

The Vice-Chancellor found as facts that Ryan had been guilty of willfully violating the Small Loan Law in furtherance of the scheme of obtaining and effectuating loans in question and also that defendants had knowledge of and approved these illegal acts.

The testimony abundantly justifies the factual findings of the Vice-Chancellor. The appellants argue that the loans were made under the Small Loan Act and that by its clear terms (section 13) the borrower, under the facts in this case, is entitled to recover from the lender "any sums paid or returned to the lender by the borrower on account of or in connection with the loan." The argument is that the act declares the public policy to be to curb the lender and not the borrower. It is true that the purpose of the act was to protect a small loan borrower from the usury of the lender but we do not find any provision of the act which divests equity from its time honored maxims that he who seeks equity must do equity and must have clean hands. To ignore these maxims where the facts show such shocking conduct on the part of the complainant who flagrantly violated the law would be inequitable and unjust. Likewise, to permit the defendants to have relief under their counter-claim where the facts are that they were parties to the fraud would be inequitable and unjust.

The Vice-Chancellor summarized his conclusions as follows:

"That the parties to this suit conspired to contravene the statute, to perpetrate a fraud on the law, admits of no doubt. It has been so found by this court, and by a jury in a court of law. However remedial our Small Loan Act may be, or whatever may have been its purpose, it was certainly not designed to reward or encourage fraud. The underlying reason for the drastic provisions of the act for the protection of the borrower is his credulity and susceptibility to oppression by reason of his necessitous circumstances. It was that class of borrowers the statute was designed to protect. It was not designed to protect the criminally minded—those

borrowers who were not motivated in their transactions by distress and necessity. Certainly not to protect a man like Ryan who was not under the pressure of want or necessity, who was not the type susceptible to oppression, but who voluntarily entered into a conspiracy with the defendants to commit a fraud upon the act and defeat its provisions. Ryan was prompted by his desire to do business on a large scale; the defendants by a desire for a ready market for their repossessed cars and their greed for thirty per cent. interest. Both parties entered into the nearly 500 transactions with their eyes wide open, with full knowledge of the law, and a deliberate purpose to set at naught the provisions of the act. It is true that the penalties of the act seem to be directed solely to the lender, and the advantages or benefits, aside from the provisions permitting an outrageous interest charge by the lender, reserved solely for the borrowers. But these penalties were designed to prevent oppression of the weak and poor; they were not designed as rewards for the perfidy of the borrower. Where no oppression is involved, no advantage taken by the lender of the borrower, the transaction being entered into with the deliberate purpose of defeating the statute, the parties are both *particeps criminis* and *in pari delicto,* and the rule not the exception applies. Certainly it was not the intention of the legislature to preclude the courts, in such cases, from finding as a fact that the parties were *in pari delicto.* It was not intended that the hand of the court should be forced, or that it should be stayed in the application of the fundamental principles of justice.

"In *Prindiville* v. *Johnson and Higgins, supra (Court of Errors and Appeals, 1921),* Gummere, C. J., speaking for the Court of Errors and Appeals, said:

" 'The complainant, according to the averments of his bill and the undisputed facts set out in the answer and developed by the proofs, came into the Court of Chancery for the purpose of having it there declared that a scheme, in the execution of which he was an active participant and the recipient of very large sums of money, was a fraud upon our statute, a violation of our public policy, and therefore, null and void,

and sought to have an adjudication in his favor, based upon these facts, in order that he may now enjoy the benefits which can only come to him as a result of such an adjudication. Stated, shortly, his position is this: Having for some eight years participated in the carrying out of this fraudulent scheme and reaped the benefit thereof, he now seeks, either for his own personal benefit or as the self constituted representative of the state, to have this fraudulent scheme ended and our state law and policies vindicated.

" 'So far as the vindication of our laws and policies is concerned, it is enough to say that the state does not need his aid for any such purpose, and that his assumed status as a representative of the state cannot be recognized.

" 'If we consider him as a mere individual seeking to repudiate for his own personal advantage a fraud upon the state in which he was so long a participant, it is entirely settled that the Court of Chancery is not open to him for any such purpose. It is a maxim of equity that a court of conscience will not even listen to a suitor who comes into that tribunal with unclean hands, and this doctrine is applicable whenever it appears that the litigants seek to be relieved of the consequences of a fraud in which he has been an active participant. The courts of this state have steadfastly refused to lend their aid to a wrongdoer either by the enforcement of an illegal contract or by relieving the wrongdoer from the obligations thereof, and this they do, not out of regard for the defendant in the action, but because of their unwillingness to use the powers which were granted to them for the furtherance of lawful ends in aiding schemes which are in their nature venal, or for the purpose of relieving parties from the liabilities which such schemes create.'

"I am unable to see any difference in principle between that case and the one now before the court. There, the complainant had participated in a scheme which was a fraud on the statute—it is the same here. There, the acts were in violation of our public policy and therefore null and void—it is the same here. The language of the Chief-Justice in that case might well be paraphrased thus for the purpose of this

case: 'Having for about two years participated in the carrying out of this fraudulent scheme and reaped the benefit thereof, he now seeks * * * for his own personal benefit * * * to have this fraudulent scheme ended·and our state laws and policies vindicated. So far as the vindication of our laws and policies is concerned, it is enough to say that the state does not need his aid for any such purpose. * * * If we consider him as a mere individual, seeking to repudiate for his own personal advantage a fraud upon the state in which he was so long a participant, it is entirely settled that the Court of Chancery is not open to him for any such purpose.'

"The last paragraph of the opinion may be quoted *verbatim* and applied here. Ryan is not only seeking to be relieved of the consequences of a fraud in which he was so long an active participant, but he is also seeking to obtain the benefits of the very statute which is the subject of his fraud. A moment's appraisal of just what is sought by Ryan in this suit is sufficient to shock the conscience of the court and close its door against him. He claims to have paid the defendant companies more than $50,000 on account of the 472 illegal loans. At the time of the accounting between the parties there remained a balance of over $28,000 unpaid, of which balance some $13,000 was realized by the sale of the automobiles taken in replevin. Ryan asks that he be rewarded for his perfidy by a decree of this court compelling the defendants to repay him from $50,000 to $63,000, and relieving him of the remaining obligations; and this notwithstanding the fact that what he has paid obviously came from the sale of the automobiles purchased from the defendants and for which his notes were given in payments. He asks a reward of $50,000 to $63,000 for his fraud on the statute. He is entitled to relief on his outstanding contracts to the extent that it is afforded to him by a refusal to entertain the defendant's counter-claim. He is not entitled, in this court, to any reward for his perfidy. Nor are the defendants rewarded by denying reward to the complainant. They lose about $16,000 as a result of their fraud, which is a

punishment to fit their crime; and under the statute they are liable to indictment for misdemeanor. If it be said that Ryan is not seeking reward for his perfidy but only the enforcement of a substantive right given him by the statute, as was said in *Missouri K. and T. Tr. Co.* v. *Krumseig, supra,* the answer is that he has forfeited that right by his deliberate fraud, and the act was not designed to encourage fraud. Had the legislature intended to prevent the court from making any inquiry as to the relative guilt of the parties to transactions such as are here involved, it could have said so in plain language as has been done by the legislature in other jurisdictions. See *Kansas Laws 1860 ch. 75* ¶ *3,* referred to in *Marshall* v. *Beeler, supra.*"

We are in accord with these views. The decree appealed from will be affirmed, with costs.

*For affirmance*—THE CHIEF-JUSTICE, PARKER, HEHER, PERSKIE, PORTER, DEAR, RAFFERTY, HAGUE, JJ. 8.

*For reversal*—CASE, BODINE, DONGES, COLIE, WELLS, JJ. 5.