921 A.2d 427

TRACY M. THOMPSON, ACTING DIRECTOR, OFFICE OF GOVERNMENT INTEGRITY, PLAINTIFF–RESPONDENT, v. CITY OF ATLANTIC CITY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT, AND LORENZO LANGFORD AND WILLIAM MARSH, DEFENDANTS–APPELLANTS.

Argued January 29, 2007—Decided May 16, 2007.

*Fredric L. Bor* argued the cause for appellants (*Mr. Bor,* attorney; *Stephen G. Raymond,* on the brief).

*Ronald A. Epstein,* Deputy Attorney General, argued the cause for respondent (*Stuart Rabner,* Attorney General of New Jersey, attorney).

Justice ALBIN delivered the opinion of the Court.

At the time Lorenzo Langford became mayor of Atlantic City in 2002, he and a political ally, William Marsh, had a pending federal civil rights lawsuit against the City. Shortly after he assumed his post as mayor, Langford's municipal appointees negotiated a settlement of the federal suit with Langford's and Marsh's private attorneys in the amount of $850,000. With the case settled, a federal judge entered an order of dismissal.

The State's Office of Governmental Integrity (OGI) then sought to have the settlement rescinded in the Law Division because of various violations of the State's conflict of interest laws. The trial court acknowledged that the settlement violated state law, but declined to void it as a matter of comity to our federal courts.

The Appellate Division disagreed with that approach, determining that the conflicts vitiated the settlement. Applying principles of equity, the appellate panel then ordered that Langford and Marsh be allowed to seek relief first in federal court and, if that failed, to return to state court for a hearing to decide the reasonableness of the settlement.

The primary purpose of conflict of interest laws is to ensure that public officials provide disinterested service to their communities and refrain from self-dealing. A secondary purpose is to promote confidence in the integrity of governmental operations. The conflict-ridden actions of Mayor Langford's political appointees, entering into a financial settlement to benefit their boss at the expense of the City, can hardly be viewed as disinterested or inspiring confidence in government. We now hold the City's settlement with its own mayor was so infected with conflicts of interest that it is void as a matter of state law. Because the City's unlawful settlement agreement with Langford and Marsh is a nullity, the monies disbursed to both must be returned to the municipal coffers. Any further relief sought by Langford and Marsh, such as reinstating the civil rights suit, must be pursued in federal court.

## I.

### A.

This case has its genesis in the 1998 Atlantic City mayoral election when Langford attempted to unseat the incumbent, James Whelan. William Marsh was Langford's campaign treasurer. Three days after Langford lost the election, the positions that both he and Marsh held on the Atlantic City Board of Education were eliminated. Believing that they were victims of political retaliation, Langford and Marsh met with Charles Ercole, Esq., to discuss their case. Because Ercole's law firm did not represent employees in discrimination lawsuits, he referred Langford and Marsh to attorneys who specialized in that area of law. Langford

eventually retained Sidney Gold, one of the attorneys recommended by Ercole. Marsh retained separate counsel.

In June 1999, Langford and Marsh filed a federal civil rights action under 42 *U.S.C.A.* § 1983 in the United States District Court for the District of New Jersey, naming as defendants Atlantic City, Mayor Whelan, and various members of the city council. The complaint alleged that the defendants eliminated Marsh's position as a neighborhood facilities coordinator and Langford's position as a neighborhood facilities liaison in retaliation for their constitutionally protected political activities.[1] Later that year, United States District Court Judge Joseph E. Irenas dismissed the complaint pursuant to *Federal Rule of Civil Procedure* 12(b)(6). The United States Court of Appeals for the Third Circuit, however, reversed and reinstated the case, which then proceeded through a lengthy pre-trial discovery period.

In 2001, with his federal case still pending and while a member of the city council, Langford ran for mayor again, and this time emerged victorious in the November election. During the campaign, Ercole served as Langford's co-finance chair, hosted fund-raising events for Langford, and, in his capacity as a lawyer, agreed to accept service of a complaint filed against Langford by his mayoral opponent.[2]

After the election, the City and the attorneys for Langford and Marsh entered into settlement discussions in an effort to resolve the federal lawsuit before Langford assumed office on January 2, 2002. During an executive session of the city council on December 12, 2001, the city solicitor, Mary Siracusa, advised the council that Judge Irenas indicated that the case should settle for a nominal amount and if it did not settle during the transition period, he was not certain how he would proceed. Judge Irenas

---

[1] Marsh earned approximately $79,000 annually and Langford approximately $30,000 annually in their respective positions.

[2] Ercole had been retained by the Atlantic City Democratic Committee at the time.

did not "feel comfortable" with a situation in which the city solicitor would recommend a settlement to the mayor about his own case. Judge Irenas also had suggested that he might place the case "on hold" for four years or appoint independent counsel to represent the City's interests. As a result of her discussions with Mayor Whelan and the attorney representing the City in the federal action, the city solicitor recommended that $300,000 be offered to settle the case. Langford and Marsh had demanded a $1,000,000 settlement.

Two weeks later, Council President Ernest Coursey proposed and the council adopted a resolution, offering a settlement inclusive of attorneys' fees of $600,000 to Marsh and $400,000 to Langford. The council solicitor at that meeting, Christopher Brown, told the council that under the Faulkner Act only the mayor had the power to settle the case and that the council's role was limited to "advice and consent." Although the attorneys for Marsh and Langford expressed their willingness to accept the $1,000,000 settlement proposed by the council, the outgoing mayor never consented to making such an offer to settle the case.

On January 2, 2002, with his federal suit against the City scheduled for trial in early February, Langford assumed the position of Atlantic City mayor and appointed Benjamin Fitzgerald as Atlantic City's business administrator. Approximately two weeks later, Langford named Fitzgerald to serve as acting mayor in circumstances when Langford could not attend to his official duties. On January 16, at Langford's request, the council adopted a resolution allowing Langford to retain Charles Ercole to provide legal services to the City.[3] Ercole proceeded to advise the City concerning the federal lawsuit filed by Langford and Marsh. In addition, by letter dated January 16, Ernest Coursey informed the city clerk that he would be resigning his position as councilman,

---

[3] The contract was for one year and it was for a maximum of $200,000.

effective January 31, 2002, to become Mayor Langford's confidential aide.[4]

On January 30, when the city council went into executive session to discuss a settlement of Langford's and Marsh's lawsuit, Coursey remained at his post as councilman. At that meeting, Ercole provided legal advice to the City, and Fitzgerald, the business administrator, acted in place of the mayor.[5]

Ercole stated that the $1,000,000 settlement offer previously approved by council resolution was an "appropriate number, in light of the potential risk of the case."[6] Citing budgetary concerns, Fitzgerald recommended that the offer be reduced to $850,000. Coursey, just days away from becoming Langford's confidential aide, agreed that the case should be settled for the reduced amount. The $850,000 settlement proposal received the backing of a majority of the council. At the meeting, Diana Fauntleroy, Esq., the council solicitor, expressed concern about the "level of conflicts that exist between the Council and the Mayor's office," particularly noting that the council was "approv[ing] a settlement with a sitting Mayor who was a former Council member." The council did not heed Fauntleroy's advice to withhold voting until a "written opinion" was issued addressing the potential conflicts. One councilman, Timothy Mancuso, observed: "[T]here's conflict written all over this. Publicity is going to look at you guys delivering a package to the new Mayor." He added that Coursey could have a conflict because "you got a job from the Mayor and you're voting to give him a million dollars."

On January 31, 2002, the City communicated the $850,000 settlement offer, which was accepted by Langford and Marsh. An

---

[4] As full-time confidential aide, Coursey earned an annual base salary of $60,000. As part-time councilman, he received a salary of $29,800.

[5] Langford did not participate in the meeting.

[6] At no time did Ercole disclose the fact that he previously met with Langford and Marsh concerning the case several years earlier.

attorney acting for Langford and Marsh requested that the City provide one check for the settlement amount. That same day, having been informed of the settlement, Judge Irenas signed an order dismissing the federal suit.

Thereafter, on February 13, 2002, the council went into executive session to discuss a letter from Fauntleroy that set forth her analysis of the conflicts that placed in question the validity of the settlement. Fauntleroy explained that a potential conflict of interest existed because of both Ercole's and Fitzgerald's participation in the settlement negotiations. She recommended that the council retain an independent attorney—unconnected to the mayor—to determine if the settlement was in the best interest of Atlantic City.[7] On February 27, the council reconsidered the conflicts issue, and by a vote of five in favor, one against, and one abstaining, upheld the settlement tendered to Langford and Marsh. Before the vote, Councilman Mancuso urged the council to await a review by the Attorney General.[8]

Indeed, three weeks earlier, Councilman Mancuso forwarded a letter to the Attorney General questioning the legality of the settlement. By telefaxed letter dated February 28, 2002, Edward M. Neafsey, the Inspector General, (later designated Director of the Office of Government Integrity (OGI)), advised Ercole and Langford that the Attorney General had asked his office to investigate the allegations in Mancuso's letter.[9] Neafsey requested that the City refrain from disbursing the settlement monies

---

[7] Fauntleroy also suggested that the council propose that Langford's claims be separated from Marsh's, but the council believed that approach would not succeed because the two were acting in unison.

[8] Langford was at this meeting, although he did not participate in the discussion of the settlement resolution. Marsh was also at the meeting, because he was sworn in that day to fill a council vacancy.

[9] The Office of Inspector General was later designated the Office of Governmental Integrity. For consistency's sake and to avoid confusion, we refer to both as OGI.

until OGI had time to review the alleged violations of law. Contrary to that request, the next day the City's business administrator, Fitzgerald, authorized the release of the settlement monies to Langford's and Marsh's attorneys.

Assistant Attorney General (AAG) John Kennedy spoke with Marsh's attorney on March 5 and Langford's attorney on March 6, and requested that both seek their clients' consent to hold the settlement checks in escrow pending completion of OGI's inquiry. Not willing to brook delay, Marsh and Langford declined to accept OGI's request and instructed their attorneys to disburse the settlement funds. The attorneys forwarded letters memorializing their clients' positions to AAG Kennedy. However, before AAG Kennedy received those letters, he warned the attorneys by his own letter dated March 15, 2002 that their clients were proceeding at their own peril should the monies be disbursed and the settlement later invalidated.

## B.

On March 18, 2002, Inspector General Neafsey filed a Complaint in Lieu of Prerogative Writs in the Law Division seeking to rescind the settlement agreement due to impermissible conflicts of interest. Neafsey also sought restitution for Atlantic City or imposition of a constructive trust on the settlement funds.[10] The City, Langford, and Marsh were named as defendants. On June 30, 2005, a year after the parties filed cross-summary judgment motions, the trial court rendered a comprehensive written decision.

The trial court first determined that the settlement violated the Faulkner Act, *N.J.S.A.* 40:69A–1 to –210, due to multiple conflicts of interest. Under the mayor-council plan of the Faulkner Act, the mayor's statutory responsibilities include the power to settle lawsuits. The trial court concluded that "once Langford assumed

---

[10] An Amended Complaint was filed May 17, 2002.

the Office, settlement of the litigation became a legal impossibility." The court maintained that "there is no provision in the Faulkner Act to permit the Mayor or Acting Mayor to settle litigation which inures to the personal financial benefit of the sitting Mayor." Thus, Fitzgerald, who was appointed by Langford as the business administrator, could not in his temporary position as acting mayor "negotiate a financial settlement" in which he was representing the interests of the City against his boss, the mayor. Likewise, Ercole, who received a $200,000 legal services contract negotiated by Mayor Langford, while representing the City's interests, found himself recommending a settlement that benefited the mayor personally. Moreover, Coursey in one of his last acts as councilman before becoming the mayor's confidential aide voted to approve a settlement of Langford's case.

Although the trial court found that the settlement was invalid under state law, it concluded that "to rescind the settlement agreement" and impose a constructive trust, as argued by OGI, would be "tantamount to the state court vacating a federal court order." The trial court held that it did not have the power to "invade the jurisdiction of the federal court by vacating a settlement which resulted in the dismissal of the federal litigation pursuant to an order entered by the United States District Court." Thus, the court entered summary judgment in favor of Langford and Marsh and declined OGI's invitation to rescind the settlement with restitution or order imposition of a constructive trust.

OGI appealed.

### C.

The Appellate Division agreed with the trial court that the Faulkner Act "neither contemplates nor provides for a process for a Mayor to settle litigation during his term of office, in which he is the plaintiff suing the City." *Thompson v. City of Atlantic City,* 386 *N.J.Super.* 359, 368–69, 901 *A.*2d 428 (App.Div.2006) (internal quotation omitted). The appellate panel also agreed that "inherent and actual conflicts" infected the whole process and that key

mayoral aides purportedly representing the City's interests in a matter adverse to their chief executive "rendered untenable the settlement agreement." *Id.* at 369, 901 *A.2d* 428.

Moreover, the panel reasoned that Marsh's claims could not be "parsed" from those of Langford. *Id.* at 370, 901 *A.2d* 428. The panel observed that Marsh was content not to distinguish his claim from that of the mayor, thus standing fast with the mayor when he benefited from a lump sum settlement payment. *Ibid.* Additionally, the panel believed that Marsh's "appoint[ment] to fill a council vacancy the same day that the Council adopted a resolution authorizing transfer of the settlement funds to him and Langford" suggested that he "was hardly the innocent bystander caught up in the web of conflicts generated by Langford's election as mayor." *Ibid.*

Unlike the trial court, however, the panel concluded that it was not powerless to invalidate the conflict-ridden settlement and to fashion equitable remedies, including a constructive trust, to suit the unique circumstances of the case. *Id.* at 370–71, 380, 901 *A.2d* 428. First, the panel reasoned that voiding the settlement—a contract in violation of state law—did not tread on the jurisdiction of the federal courts. *Id.* at 363, 370–71, 901 *A.2d* 428. With the doctrine of limited jurisdiction of federal courts as a backdrop, the panel focused on the significance of Judge Irenas's dismissal order. Because the panel determined that Judge Irenas's dismissal order only expressed the intent to retain jurisdiction over disputes between the original parties regarding the enforcement of the settlement agreement, OGI's challenge to the legality of that agreement was properly filed in state court. *Id.* at 373–74, 901 *A.2d* 428.

Next, the panel considered the equitable remedy of imposing a constructive trust on the settlement proceeds paid to Langford and Marsh. *Id.* at 375–78, 901 *A.2d* 428. A constructive trust is an appropriate remedy to redress a "wrongful act" that results in "unjust enrichment." *Id.* at 376–77, 901 *A.2d* 428. Having decided that the settlement monies were received through a "wrongful

act," the panel stated that the only remaining question was whether Langford and Marsh were "unjustly enriched." *Id.* at 377, 901 *A.*2d 428. The answer to that question, according to the panel, required a finding "whether the amount paid by the City to settle the federal action was fair and reasonable." *Ibid.*

To address that issue, the panel ordered a remand to the trial court to "allow[ ] the parties a full and fair opportunity to be heard" concerning the "ultimate disposition of the settlement proceeds." *Id.* at 379–80, 901 *A.*2d 428. The panel instructed the trial court to "direct the parties to the federal action to seek relief, in the federal court, from the [dismissal] order," but not "to direct the federal judge to do anything." *Id.* at 380, 901 *A.*2d 428 (emphasis omitted). It recognized that if the federal court "re-open[ed] the federal action, then a forum will have been created for the adjudication of Langford and Marsh's claims." *Ibid.* Alternatively, in the absence of a federal forum to adjudicate the issue, the panel held that the trial court "should proceed to determine the reasonableness of the settlement agreement." *Ibid.* One suggested approach "to a full and fair resolution" was to adapt the trial-within-a-trial format, allowing for "a 'trial' of the federal suit within the trial of the OGI's suit." *Ibid.* Pending the outcome of those determinations, the trial court was vested with authority to direct the return of the settlement funds, in whole or in part, to the City. The panel conferred on the trial court the discretion to order other appropriate equitable or legal remedies. *Id.* at 380, 901 *A.*2d 428.

We granted the petition for certification of defendants Langford and Marsh. 188 *N.J.* 490, 909 *A.*2d 725 (2006).

## II.

Defendants Langford and Marsh advance four arguments explaining why the Appellate Division erred in invalidating the settlement agreement. First, they maintain that any challenge to the settlement agreement by OGI should have been filed in federal court because the *Federal Rules of Civil Procedure* allowed for

relief from Judge Irenas's Order of Dismissal. At the very least, they add, OGI should have attempted to intervene as a party in federal court before seeking to vitiate the settlement agreement in state court. In defendants' view, OGI's failure to follow "well-settled principles of comity" has led to a state court's unwarranted intrusion into the domain of the federal courts and, more particularly, to a state court undermining the finality of a federal judgment.

Second, defendants insist that vacating the settlement will leave them without a remedy in the federal forum in which they filed their civil rights case, explaining that the *Federal Rules of Civil Procedure* do not provide an avenue for reopening their § 1983 claim at this late date. Third, they consider the constructive trust to be an oppressive rather than an equitable device, requiring them to make restitution after they have already paid attorneys' fees and taxes on the settlement proceeds. Last, Marsh claims that even if conflicts of interest attending Langford's position as mayor rendered Langford's settlement a nullity, he "did nothing wrong" and therefore it would be "manifestly unfair" for his settlement to be declared invalid.

### A.

■ In responding to those arguments, we begin by affirming the Appellate Division's conclusion that the settlement agreement between the City and Langford and Marsh was infected by intolerable conflicts of interest and therefore violated state law. To understand the nature and extent of those conflicts requires a brief review of Atlantic City's governmental structure.

■ Atlantic City is organized under the Faulkner Act's mayor-council plan. *N.J.S.A.* 40:69A–32(a). The Faulkner Act vests the mayor with the executive functions and the council with the legislative functions of local government. *Mun. Council of Newark v. James*, 183 *N.J.* 361, 364–66, 873 *A.*2d 544 (2005). Under the mayor-council plan, significant power is concentrated " 'in the hands of a highly-visible, independently elected Chief

Executive who has substantial power over the administration.' " *McCann v. Clerk of Jersey City*, 167 *N.J.* 311, 330, 771 *A.*2d 1123 (2001) (quoting 34 *New Jersey Practice, Local Government Law* § 4.15 (Michael A. Pane) (rev.3d ed.1999)). Among the mayor's executive functions is the authority to negotiate and sign all contracts for the municipality. *N.J.S.A.* 40:69A–40g, j. The council is empowered to approve or reject contracts presented by the mayor. *N.J.S.A.* 40:69A–36*l*. Because a "settlement agreement between parties to a lawsuit is a contract," *Nolan v. Lee Ho*, 120 *N.J.* 465, 472, 577 *A.*2d 143 (1990), when a municipality is involved in litigation, it necessarily falls within the mayor's purview to decide whether to enter into a settlement and, if so, to negotiate the terms of that settlement.

▪ The broad grant of authority to the mayor, however, is qualified by "a heightened standard of ethical responsibility." *McCann, supra*, 167 *N.J.* at 331, 771 *A.*2d 1123. Clearly, under the Faulkner Act, a mayor cannot prosecute a lawsuit for money damages against the municipality he leads and at the same time defend it against that litigation. Nor could he negotiate for the municipality the terms of a settlement agreement from which he would financially benefit. The question raised here is whether the conflict that disqualifies the mayor from acting for his own personal benefit also disqualifies those who generally answer to him and who are directly beholden to him in his official authority.

▪ The citizens of every municipality have a vested right to the disinterested service of their elected and appointed officials, whose undivided loyalty must be to serve the public good. Public confidence requires that municipal officials avoid conflicting interests that convey the perception that a personal rather than the public interest might affect decisionmaking on matters of concern. Officials must be free of even the potential for entangling interests that will erode public trust in government actions. Thus, it is the potential for conflict, rather than proof of an actual conflict or of actual dishonesty, that commands a public official to disqualify himself from acting on a matter of public interest. *See Griggs v.*

*Borough of Princeton,* 33 *N.J.* 207, 219, 162 *A.*2d 862 (1960) ("The question is whether there is a potential for conflict, not whether the public servant succumbs to the temptation or is even aware of it."); *see also Wyzykowski v. Rizas,* 132 *N.J.* 509, 523–26, 626 *A.*2d 406 (1993) (noting that conflict of interest exists where there are " 'contradictory desires tugging the official in opposite directions' " (quoting *LaRue v. Township of E. Brunswick,* 68 *N.J.Super.* 435, 448, 172 *A.*2d 691 (App.Div.1961))).

■ The test for disqualification is fact-sensitive and depends on whether, under the circumstances, a particular interest "had the likely capacity to tempt the official to depart from his sworn public duty." *Van Itallie v. Borough of Franklin Lakes,* 28 *N.J.* 258, 268, 146 *A.*2d 111 (1958). *See generally Wyzykowski, supra,* 132 *N.J.* at 524–25, 626 *A.*2d 406 (cataloging cases in which common law applied to local government conflicts). In that context, we have held that "it is most doubtful that participation by a councilman in a municipal action of particular benefit to his employer can be proper in any case." *Pyatt v. Mayor & Council of Borough of Dunellen,* 9 *N.J.* 548, 557, 89 *A.*2d 1 (1952).

The common law conflict-of-interest doctrines governing the conduct of municipal officials are now supplemented by the Local Government Ethics Law, *N.J.S.A.* 40A:9–22.1 to –22.25. *See Wyzykowski, supra,* 132 *N.J.* at 529, 626 *A.*2d 406. In accordance with *N.J.S.A.* 40A:9–22.21, Atlantic City has enacted a local ethics code that faithfully tracks the language of the state code. Atlantic City's ethics code provides that "[n]o officer or employee shall use or attempt to use his or her official position to secure unwarranted privileges or advantages for himself or others." *Code of the City of Atlantic City* § 22–3C; *see also N.J.S.A.* 40A:9–22.5c. In addition, under its municipal code "[n]o officer or employee shall act in his or her official capacity in any matter where he or she has ... [a] personal involvement that might reasonably be expected to impair his objectivity or independence of judgment." *Code of the City of Atlantic City* § 22–3D; *see also N.J.S.A.* 40A:9–22.5d. Atlantic City promulgated standards of ethical conduct for its

officials, recognizing that the effectiveness of government "depends upon the public's confidence in the integrity of its elected and appointed representatives." *Code of the City of Atlantic City* § 22–1A(2).

In light of the conflict-of-interest doctrines embodied in the common law, statutory law, and municipal code, we conclude that the executive branch officials who negotiated and approved the settlement agreement with the mayor and Marsh were afflicted by disqualifying conflicts. The public had good reason to suspect that Fitzgerald, Ercole, and Coursey might not be able to exercise complete objectivity and independence in assessing the merits of the lawsuit filed by the mayor—their nominal employer. Those officials were subject to contradictory impulses—friendship and economic livelihood in conflict with the public interest. Given the allegiance of those officials to the mayor, Atlantic City's citizens might question whether they were serving the City's interests or Langford's interests. In the public's mind, could Fitzgerald, Ercole, and Coursey have fought tooth-and-nail against the mayor's lawsuit and retained the mayor's favor afterwards? It is the very posing of that question that makes real the conflicts here.

All three officials owed their jobs directly to Langford. Shortly after appointing Fitzgerald as business administrator, Langford designated him to serve as acting mayor when circumstances required, such as in this case. *See N.J.S.A.* 40:69A–42 ("The mayor shall designate the business administrator, any other department head, or the municipal clerk to act as mayor whenever the mayor shall be prevented ... from attending to the duties of his office."). Fitzgerald, who on a daily basis answered directly to Langford, therefore, took on the responsibility of deciding whether to settle his patron's lawsuit and the terms of the settlement. In the public's eye, that task—assessing the merits and worth of Langford's case and the best interests of the City—would have strained the objectivity of the most upright and resolute municipal official. Fitzgerald, realistically, should not have been asked to choose between two masters. Significantly, against the explicit

wishes of OGI, which was conducting its investigation, Fitzgerald disbursed the settlement proceeds to the mayor's and Marsh's attorneys.

Next, Ercole, a lawyer, gave advice to Langford and Marsh in 1998 when they consulted with him about their then potential civil rights lawsuit against the City. Because Ercole only represented management in such cases, he referred the future mayor to another lawyer. In Langford's 2001 campaign, Ercole served as a fundraiser and as a legal advisor, agreeing to accept service for an election-related complaint filed against Langford. Through, in part, Langford's largesse, Ercole received a $200,000 contract to render the City's legal services. Ercole urged the city council to settle Langford's lawsuit for $850,000. Inexplicably, Ercole never disclosed to the council that Langford had sought his advice in the suit against the City. Those entangling relationships with Langford gave the impression that Ercole might not exercise objectivity in representing the interests of the City, and he should have disqualified himself from handling the matter.

Last, in his waning days as councilman and while readying himself to undertake his role as confidential aide to the mayor, Coursey voted to award Langford and Marsh an $850,000 settlement. In effect, Coursey was prepared to ratify the payment of municipal funds to the City's adversary and his soon-to-be boss, the mayor. Although a final council vote endorsing the settlement agreement occurred after Coursey resigned as councilman, having just joined the mayor's staff, the appearance that the agreement was brokered through a corrupt influence lingered.

The combination of conflicts gave the unmistakable appearance of self-dealing and had the clear capacity to undermine public confidence in the integrity of Atlantic City's governmental operations. Thus, the settlement agreement, which was tainted by blatant conflicts of interest at its inception, violated public policy and our law. Moreover, the self-evident nature of the conflicts could not have been lost on Mayor Langford, who contentedly stepped aside while his minions did his bidding. Marsh, co-plaintiff in the federal action, too benefited from the mayor's

privileged position and knowingly declined to separate his case from Langford's, requiring that any settlement be a collective one.

B.

Thus, the settlement agreement that brought an end to the federal lawsuit violated state law. The question remains, however, whether the Office of Governmental Integrity, which was not a party to the federal action, properly challenged the settlement agreement in state rather than federal court and whether a Superior Court judge possessed the authority to invalidate the agreement. The answer requires a short primer on principles of federal jurisdiction and an examination of Judge Irenas's dismissal order to determine if the federal court retained jurisdiction to resolve OGI's challenge to the settlement agreement.

Federal and state courts exercise distinct powers within our federal system of government. Under that system, the United States Constitution confers on the federal government "limited and enumerated powers" and leaves to the states the "general police power to provide for the safety, health, morals, and general welfare of society." Thomas E. Baker, *A Catalogue of Judicial Federalism in the United States,* 46 *S.C. L.Rev.* 835, 842 (1995). Consistent with that scheme, federal courts only have limited jurisdiction—that is the jurisdiction to hear cases authorized by the Federal Constitution or federal statutes. *Willy v. Coastal Corp.,* 503 *U.S.* 131, 135, 112 *S.Ct.* 1076, 1079, 117 *L.Ed.*2d 280, 287 (1992) (noting that federal jurisdiction cannot be expanded by judicial declaration); *Am. Fire & Cas. Co. v. Finn,* 341 *U.S.* 6, 17–18, 71 *S.Ct.* 534, 542, 95 *L.Ed.* 702, 710–11 (1951). In federal cases, "there is a general presumption against federal jurisdiction," and the plaintiff has the burden of overcoming that presumption and establishing the specific basis for jurisdiction. *Erienet, Inc. v. Velocity Net,* 156 *F.*3d 513, 519 (3d Cir.1998); *see also Turner v. Bank of N. America,* 4 *U.S.* 8, 11 (4 Dall.), 1 *L.Ed.* 718, 719 (1799). On the other hand, in state cases, the plaintiff has no comparable duty to set forth the grounds for the exercise of state jurisdiction. That is because state courts are invested with

general jurisdiction that provides expansive authority to resolve myriad controversies brought before them. *See Turner, supra,* 4 *U.S.* at 11, 1 *L.Ed.* at 719 (noting that subject matter jurisdiction is presumed for courts of general jurisdiction unless proved otherwise).

Generally, a settlement agreement is governed by principles of contract law. *New Jersey Mfrs. v. O'Connell,* 300 *N.J.Super.* 1, 7, 692 *A.*2d 51 (App.Div.), *certif. denied,* 151 *N.J.* 75, 697 *A.*2d 547 (1997). A settlement agreement usually involves the payment of money by one party in consideration for the dismissal of a lawsuit by the other party. Rescission or enforcement of that agreement typically will depend on state law. *See Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 *U.S.* 375, 381–82, 114 *S.Ct.* 1673, 1677, 128 *L.Ed.*2d 391, 397–98 (1994) (noting that action to enforce settlement agreement is typically state breach of contract action); *Nolan, supra,* 120 *N.J.* at 472, 577 *A.*2d 143.

Given that federal courts have limited jurisdiction and that state law is generally the guiding authority in determining the validity of most settlement agreements, "[w]hen the initial [federal] action is dismissed [pursuant to a settlement agreement], federal jurisdiction terminates." *O'Connor v. Colvin,* 70 *F.*3d 530, 532 (9th Cir.1995). Enforcement of a federal settlement agreement requires an independent basis for jurisdiction. *See Kokkonen, supra,* 511 *U.S.* at 378–82, 114 *S.Ct.* at 1675–77, 128 *L.Ed.*2d at 395–98. That can occur, for example, when a federal court has specifically retained jurisdiction by incorporating the terms of a settlement agreement in a dismissal order. *Id.* at 381–82, 114 *S.Ct.* at 1677, 128 *L.Ed.*2d at 397–98.

The United States Supreme Court elaborated on that principle in *Kokkonen,* a case concerning whether a federal district court had jurisdiction to enforce a settlement agreement that was the basis for the dismissal of a federal lawsuit. In that case, the Supreme Court held that the federal district court did not have jurisdiction to enforce the settlement agreement because the enforcement action was not "a continuation or renewal of the

dismissed suit, and hence require[d] its own basis for jurisdiction." *Id.* at 378, 114 *S.Ct.* at 1676, 128 *L.Ed.*2d at 396. The Court explained that the district court could have exercised ancillary jurisdiction to enforce the settlement agreement only if it "had been made part of the order of dismissal—either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order." *Id.* at 381, 114 *S.Ct.* at 1677, 128 *L.Ed.*2d at 397. Only in those limited circumstances would the breach of a settlement agreement become a violation of a dismissal order and confer jurisdiction on the district court. *Ibid.* In *Kokkonen,* the dismissal order did not contain a provision reserving to the federal district court the power to enforce the settlement, thus any enforcement proceeding had to be pursued in the state courts. *Id.* at 382, 114 *S.Ct.* at 1677, 128 *L.Ed.*2d at 398.

When a federal district court has not retained jurisdiction after entering an order dismissing a lawsuit, a state court has the power not only to enforce a settlement agreement, but also to invalidate an agreement that is contrary to public policy, as occurred in *Vincent v. Reynolds Memorial Hospital,* 728 *F.*2d 250 (4th Cir. 1984). In that case, the state courts of West Virginia voided on public policy grounds a settlement agreement that had led to the dismissal of a federal lawsuit. *Id.* at 251. The aggrieved plaintiff then sought to vacate the dismissal and reopen the lawsuit in federal court. *Ibid.* The United States Court of Appeals for the Fourth Circuit Court concluded that "any claim that the West Virginia courts were without jurisdiction to decide the validity of the underlying settlement agreement was patently without merit." *Id.* at 251 n.2. Based on the state court's invalidation of the settlement agreement, the Fourth Circuit directed the district court to vacate the dismissal order, entered almost seven years earlier, and to allow the reopening of the federal case pursuant to *Federal Rule of Civil Procedure* 60(b)(6).[11]

---

[11] *Federal Rule of Civil Procedure* 60(b)(6) provides: "On motion and upon such terms as are just, the court may relieve a party or a party's legal

## C.

With those precepts in mind, we now must see whether the order dismissing Langford's and Marsh's federal lawsuit provided for the retention of jurisdiction by the federal district court in the event of a challenge to the settlement agreement by a third party, such as the Office of Governmental Integrity. The dismissal order entered by Judge Irenas stated:

IT IS on this 31st day of January, 2002, ORDERED THAT:

(1) This action is hereby DISMISSED without cost and without prejudice to the right, upon motion and good cause shown, within 60 days, to reopen this action if the settlement is not consummated; and

(2) If any party shall move to set aside this Order of Dismissal as provided in the first decretal paragraph or pursuant to the provisions of Fed.R.Civ.P. 60(b), in deciding such motion the Court retains jurisdiction of the matter to the extent necessary to enforce the terms and conditions of any settlement entered into between the parties.

Although the dismissal order clearly does not incorporate the terms of the settlement agreement, the order allows for "any party," presumably limited to the lawsuit, to bring a motion before the federal district court "to enforce the terms and conditions of [the] settlement." OGI has taken the position that it had no standing to pursue relief in federal court because it was not a *party* to the lawsuit seeking to *enforce* the settlement agreement. Instead, OGI casts itself as a *third party* that moved to *vacate* the agreement. Therefore, OGI explains that it properly challenged the validity in state court.

■ We must review the precise language of the dismissal order cognizant that federal courts generally do not find ancillary jurisdiction over a settlement agreement unless the order expressly retains jurisdiction. *See, e.g., In re Phar–Mor Secs. Litig.*, 172 *F*.3d 270, 275 (3d Cir.1999) (noting that "unexpressed intent is insufficient to confer subject matter jurisdiction"). We do not find an expressed intent in the order to retain jurisdiction over the

representative from a final judgment, order, or proceeding for ... any other reason justifying relief from the operation of the judgment."

settlement agreement. We agree with OGI that the dismissal order, by its terms, limits ancillary jurisdiction to the parties in the original suit seeking enforcement of the settlement. We do not find that the federal district court intended to retain jurisdiction over a non-party to the original suit seeking to void the settlement agreement on public policy grounds. We conclude that the Superior Court had jurisdiction to decide the validity of the settlement agreement under state law.

Nonetheless, we must acknowledge at least the possibility that Judge Irenas might have read his dismissal order differently. For that reason, out of an abundance of caution and as a matter of comity, the better course might have been for the Superior Court to decline to hear the matter until OGI first exhausted its potential federal remedies. Then, if the federal court concluded it had no jurisdiction, the Superior Court could have proceeded to render a decision on the validity of the settlement agreement.

Comity is practiced when a court of one jurisdiction voluntarily restrains itself from interfering in a matter falling within the purview of a court of another jurisdiction. *See Yancoskie v. Del. River Port Auth.*, 78 *N.J.* 321, 324, 395 *A.*2d 192 (1978) (observing general rule of comity "that the court which first acquires jurisdiction has precedence in the absence of special equities"); *Aly v. E.S. Sutton Realty*, 360 *N.J.Super.* 214, 222, 822 *A.*2d 615 (App.Div.2003). Comity is grounded in notions of accommodation and good-neighborliness, and is a necessary expedient to preserve the delicate balance of power and harmonious relations among the various sovereigns of our federalist system. *See City of Philadelphia v. Austin*, 86 *N.J.* 55, 64, 429 *A.*2d 568 (1981).

Nevertheless, because we ultimately conclude that federal jurisdiction was not retained, the matter is properly before us. We now hold that not only is the settlement agreement contrary to state law, but that it cannot stand. "No contract can be sustained if it is inconsistent with the public interest or detrimental to the common good." *Vasquez v. Glassboro Serv. Ass'n*, 83 *N.J.* 86, 98, 415 *A.*2d 1156 (1980) (citation omitted). As previously

described in detail, the process that brought about the settlement was rife with appalling conflicts that undermine the public's confidence in the honest operation of government. *Manning Eng'g, Inc. v. Hudson County Park Comm'n,* 74 *N.J.* 113, 141, 376 *A.*2d 1194 (1977) (" 'All agreements which tend to introduce personal influence and solicitation as elements in procuring and influencing action by any department of the government are contrary to sound morals, lead to inefficiency in the public service and are illegal.' " (quoting *Driscoll v. Burlington–Bristol Bridge Co.,* 10 *N.J.Super.* 545, 575, 77 *A.*2d 255 (Ch.Div.1950), *modified,* 8 *N.J.* 433, 86 *A.*2d 201, *cert. denied,* 344 *U.S.* 838, 73 *S.Ct.* 25, 97 *L.Ed.* 652 (1952))).

We thus affirm the Appellate Division's invalidation of the settlement agreement with respect to both Langford and Marsh. Because Marsh sought an indivisible settlement agreement while riding Langford's coattails, he cannot now separate himself from the taint that pervades the whole process. Marsh will not profit from a settlement that has been irremediably compromised by the questionable conduct of public officials.

### D.

■ We next turn to the remedy. Recently, we commented that "strong remedies" must be employed to deter improper conduct by public officials. *County of Essex v. First Union Nat'l Bank,* 186 *N.J.* 46, 58, 891 *A.*2d 600 (2006). The settlement negotiations here involved egregious conflict-of-interest violations rendering the settlement itself void *ab initio* ("null from the beginning"). *Black's Law Dictionary* 1604 (8th ed.2004). Langford and Marsh were unjustly enriched at the expense of the taxpayers of Atlantic City by a settlement agreement in violation of state law. That being true, the equitable remedy is rescission of the settlement agreement and restitution of the ill-gotten settlement proceeds. *See First Am. Title Ins. Co. v. Lawson,* 177 *N.J.* 125, 137, 827 *A.*2d 230 (2003) ("Rescission voids the contract *ab initio.*"); *Restatement (First) of Restitution* § 1 (1937) ("A

person who has been unjustly enriched at the expense of another is required to make restitution to the other."). Consequently, the parties must be returned to their pre-settlement positions.

We find instructive *Driscoll, supra,* in which this Court, at the Governor's request, voided a contract as contrary to public policy because public officials involved in the negotiation process were tainted by impermissible, even fraudulent, conflicts of interest. 8 *N.J.* at 474–77, 496, 86 *A.*2d 201. The trial court found rescission and restitution to be a proper remedy. *Driscoll, supra,* 10 *N.J.Super.* at 576, 579, 77 *A.*2d 255. Although this Court found merit in the trial court's approach, we could not agree to that remedy because rescission and restitution would have prejudiced innocent third-party, bona fide purchasers of bonds. *Driscoll, supra,* 8 *N.J.* at 497, 499, 86 *A.*2d 201 (noting that rescission was prayed for and "warranted by the facts," but could not be given "because of the intervening equities of innocent third parties"). Here we have no such concern. There are no innocent third parties who would suffer from rescission.

We are not persuaded by Langford's or Marsh's argument that equity demands that they should keep their settlement monies because they have already spent them on, among other things, attorney fees and taxes. A basic equitable maxim is that "he who seeks equity must do equity." *Ryan v. Motor Credit Co.,* 132 *N.J. Eq.* 398, 401, 28 *A.*2d 181 (E. & A. 1942). Langford and Marsh chose to disregard OGI's request that they keep the settlement proceeds in their attorneys' trust accounts pending its investigation. They were warned that if they directed disbursement of the escrowed monies they did so at their peril. Having turned a deaf ear to an official agency investigating allegations of wrongdoing and having created the predicament in which they find themselves, they implore this Court to throw them a safety net and allow them to keep monies already spent. We will not do so. Although we understand that the Appellate Division attempted to delicately balance the equities and authorized the trial court to determine whether the settlement proceeds, in whole or part, should be

returned pending a hearing, we conclude that the only appropriate remedy to vindicate the public trust is the immediate restoration of the funds to the City.[12]

## III.

Finally, the only remedy that remains for Langford and Marsh is to reopen their § 1983 case in federal court.[13] *See Fed.R.Civ.P.* 60(b)(6) ("On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for ... any other reason justifying relief from the operation of the judgment."). We make no prediction whether they will succeed in doing so. We understand that "[r]elief under Rule 60(b)(6) may only be granted under extraordinary circumstances where, without such relief, an extreme and unexpected hardship would occur." *Sawka v. Healtheast, Inc.,* 989 *F.*2d 138, 140 (3d Cir.1993). We referenced earlier the *Vincent, supra,* ruling in which, following the invalidation of a settlement agreement by the West Virginia state courts, the Fourth Circuit ordered the district court to reopen the federal case under 60(b)(6) almost seven years after the dismissal order was issued. 728 *F.*2d at 251; *see also Moore's Federal Practice— Civil* § 60.48(3)(d) ("Relief from a judgment should be available [under *Fed.R.Civ.P.* 60(b)(6) ] in those rare situations in which a

---

12 We leave to the trial court the setting of a reasonable time frame for return of the settlement proceeds.

13 In the event that the federal district court did not revive the § 1983 case, the Appellate Division ruled that the Law Division "should proceed to determine the reasonableness of the settlement agreement." *Thompson, supra,* 386 *N.J.Super.* at 374, 901 *A.*2d 428. We reject that approach for two reasons. First, we do not know whether Atlantic City would have settled the case had the municipality been represented by disinterested decisionmakers. Thus, the issue is not just the reasonableness of the settlement, but whether Atlantic City would have settled at all. Second, Langford and Marsh chose the federal court as the forum for litigating their case, and there the case must be resolved. Langford and Marsh created the procedural netherworld in which they find themselves, and we will not invent a state forum for their federal civil rights case at this late date.

settlement fails, not because of one party's refusal to perform, but for reasons beyond the control of the parties that leave the settlement meaningless.").[14] In the end, however, this is a matter for the federal courts, and we express no opinion as to an expected outcome.

One final point must be made. Judge Irenas's apprehensions about potential conflicts arising from Langford's election as mayor have proven prescient. Judge Irenas signed a dismissal order after the parties advised him that they had settled the § 1983 lawsuit. We are confident that had Judge Irenas been informed of what our Court now knows he would not have tolerated a settlement agreement mired in entangling conflicts of interest. Our federal and state courts are mutually dedicated to the integrity of every facet of our civil justice system. People will never have trust in the system so long as municipal officials are perceived as pursuing a personal rather than a public interest. We have done our best to be respectful of the jurisdictional bounds that separate our federal and state courts and not to interfere with a matter falling within the distinct preserve of the federal district court.

## IV.

For the reasons expressed, we affirm and modify the judgment of the Appellate Division. The settlement agreement is invalidated, and Langford and Marsh are directed to make restitution of the settlement proceeds to the City of Atlantic City. Langford and Marsh now must seek relief from the dismissal order, if any is available, in federal court.

We remand to the trial court for proceedings consistent with this opinion.

---

14 We note that Langford is no longer the Mayor of Atlantic City and presumably there are no conflicts that would impair the City from having disinterested representation.

*For affirmance as modified/remandment*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.