928 A.2d 132 (2007)
395 N.J. Super. 120
In re Christine V. BATOR, Commissioner, Board of Public Utilities, Petitioner-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued April 25, 2007.
Decided July 23, 2007.
*133 Marguerite M. Schaffer, Bernardsville, argued the cause for appellant (Shain, Schaffer & Rafanello, attorneys; Ms. Schaffer, of counsel and on the brief; Xiaosong Li, on the brief).
Lewis A. Scheindlin, Assistant Attorney General, argued the cause for respondent (Stuart Rabner, Attorney General, attorney; Michael J. Haas, Assistant Attorney General, of counsel; Mr. Scheindlin, on the brief).
Before Judges CUFF, FUENTES and BAXTER.
The opinion of the court was delivered by
FUENTES, J.A.D.
Petitioner Christine Bator, a Commissioner of the Board of Public Utilities (Board or BPU), appeals from a decision of the State Ethics Commission (SEC) advising that she must recuse herself from any matters handled by the BPU that involve her sister's work product or about which her sister makes a presentation to the Board. Petitioner's sister is a BPU employee within the Division of Energy, holding the position of Chief of the Bureau of Rates and Tariffs.
After reviewing the record, and in light of prevailing legal standards, we affirm. We are satisfied that there is a disqualifying conflict of interest here because petitioner's sister has a significant role in matters assigned to her Bureau. Allowing petitioner to participate in matters on which her sister worked, creates a reasonable public impression that petitioner may not be impartial in considering those matters.

I
On January 9, 2006, petitioner was appointed to fill a Republican seat on the BPU. The Board consists of five members appointed by the Governor, no more than three of whom can belong to the same political party. N.J.S.A. 48:2-1c. Commissioners are appointed to a term of six years. Ibid. The Governor designates one of the members as president of the Board, who serves as the agency's chief administrative officer. N.J.S.A. 48:2-1.1.
The BPU has general supervisory and regulatory power over public utilities in New Jersey, including "any railroad, street railway, traction railway, autobus, charter bus operation, special bus operation, canal, express, subway, pipeline, gas, electricity distribution, water, oil, sewer, solid waste collection, solid waste disposal, telephone or telegraph system, plant or equipment for public use." N.J.S.A. 48:2-13. The BPU addresses "issues of consumer protection, energy reform, deregulation of energy and telecommunications services and the restructuring of utility rates to encourage energy conservation and competitive pricing in the industry."
The BPU is made up of several divisions. See New Jersey Board of Public Utilities, http://www.state.nj.us/bpu/home/ about.shtml (last visited July 6, 2007). *134 One is the Division of Energy. The Division of Energy is comprised of four bureaus: Bureau of Revenue Requirements, Bureau of Rates and Tariffs, Bureau of Market Development and System Reliability, and Bureau of Conservation and Renewable Energy.
Alice Bator (Ms. Bator) is petitioner's sister, and is employed by the BPU, holding the position of Chief of the Bureau of Rates and Tariffs. She reports to the Director and Assistant Director of the Division of Energy. Ms. Bator manages a six-member staff and oversees the staff's review of cases and issues.

II
As background for its decision, the SEC gave the following description of Ms. Bator's role within the Bureau, including the manner in which matters before the Board are handled:
When her Bureau is assigned a matter, [Ms. Bator], in turn, assigns the matter to individual staff within the Bureau. She manages and oversees their review of the case and issues, including issues litigated at the Office of Administrative Law ("OAL"). After a full record has been developed on the Bureau's issues, [Ms. Bator], together with her staff, will then develop a Bureau position. The Bureau's analysis of the case, the issues and the Bureau's position are discussed with the Assistant Director and the Director. This discussion leads to the Division position, which is then presented by the Director and/or Assistant Director to the Executive Director, the head of the Board's technical staff. The Executive Director then signs off on the staff position, which is incorporated into the recommendations in the matter as it proceeds to the Board's agenda. A similar procedure is followed for settlements.
All matters pending before the Board, whether litigated or settled, eventually move to the agenda, after an agenda package is drafted for consideration by the Commissioners. The package includes a memorandum drafted by staff involved in each matter that includes the positions of the various parties, as well as a proposed form of Decision and Order, also often drafted by staff involved in the matter with the assistance of the Deputy Attorney General ("DAG") assigned to the case. Included also are copies of Stipulations and/or Initial Decisions, if applicable. The package goes through the same chain of command noted above. Generally, the names of the staff who prepared the package and managed and supervised the case are listed on the memorandum. The memorandum is then reviewed and signed by the Director. . . .
There have been occasions where [Ms. Bator] has discussed the Bureau's position directly with the Executive Director and where she has worked on special projects which involve a team of staff whose members are not all within the Division of Energy. These occurrences are rare as are the times that she directly briefs the Board prior to an agenda meeting or makes a presentation to the Commissioners at a public agenda meeting. Her agenda presentations have not occurred in several years.
In addition to contested cases, [Ms. Bator] may work to develop Board regulations, Board comments on regulations of other agencies and matters of Board policy. Her work relating to Board policy issues and regulations usually involves cooperation and coordination with other Board staff, with final review and oversight by the Assistant Director and Director of the Division of Energy, and ultimately the Executive Director.
*135 The SEC also reviewed Ms. Bator's role in the proposed merger between the Public Service Electric and Gas Company (PSE & G) and the Exelon Corporation (Exelon), a high profile matter before the BPU:
[Ms. Bator] is overseeing/supervising the staff of the Bureau of Rates and Tariffs on certain specific areas regarding the PSE & G/Exelon merger, including synergy savings, impact on employees, service agreements and gas and electric market power issues (predominantly gas market power issues). To date, and with respect to those areas of responsibility, her Bureau has reviewed the filing and the testimony of the parties, assisted the Board staff's experts with their review and preparation of testimony, assisted the Attorney General's Office in its preparation for hearings, and attended hearings, with representation by a DAG, before the ALJ. To [the Assistant Director, Division of Energy's] knowledge, [Ms. Bator] has not made any representations to the Board in the PSE & G/Exelon matter.
In September 2006, Exelon abandoned its attempt to complete the merger. This case illustrates Ms. Bator's role and responsibilities as a senior staffer at the BPU.
In considering petitioner's inquiry, the SEC determined that an appearance of impropriety existed here, in violation of N.J.S.A. 52:13D-23(e)(7) and N.J.A.C. 19:61-7.4. Specifically, the SEC found that:
Many of the matters considered by the BPU are controversial and involve the input of competing utilities, public interest groups and consumers. These entities and individuals have an expectation that the Board members will consider all matters free of any factors that will impair their objectivity and independence of judgment. When a relative of a Board member has substantial involvement in a matter considered by the Board, a member of the public could reasonably infer that the Board member's objectivity will be compromised.
. . . .
The issue in the present case is whether a Board member can remain objective in situations in which her sister's work product is the basis for the recommendation to the Board. While [petitioner's attorney] argues that you and your sister have a common interest in performing your jobs according to the law, there is no guarantee that the public will view this common interest as in their best interest.
The SEC thus concluded that petitioner must recuse herself in Board matters that involve her sister's work product or about which her sister makes a presentation to the Board. Adhering to this advisory opinion, petitioner recused herself in twenty-seven matters that came before the BPU between February 22, 2006, and June 21, 2006.

III
Petitioner argues that the SEC's opinion was arbitrary because it ignored the "reasonableness" standard contained in the relevant statutes and regulations; failed to consider the matter in a fact-specific manner; and reached a decision incompatible with both law and equity, by disqualifying a BPU commissioner from important public matters for even minimal involvement of her sister.
We reject these arguments. Given the facts presented here, we hold that the SEC decision finding a disqualifying conflict of interest was not arbitrary or unreasonable because petitioner's sister has substantial involvement in matters assigned to the Bureau of Rates and Tariffs.
*136 We start our analysis mindful of certain bedrock principles of appellate review. In reviewing decisions of State administrative agencies, our role is a limited one. As the Supreme Court recently reaffirmed:
[W]e do not ordinarily overturn such a decision "in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence[.]" As we have consistently stated, our role, in general, is limited to determining:
"(1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors." [Finally,] . . . in reviewing agency actions, "[a]ppellate courts must defer to an agency's expertise and superior knowledge of a particular field."
[In re Carter, 191 N.J. 474, 482, 924 A.2d 525 (2007) (internal citations omitted).]
In enacting the New Jersey Conflicts of Interest Law, N.J.S.A. 52:13D-12 to -28, the Legislature found:
In our representative form of government, it is essential that the conduct of public officials and employees shall hold the respect and confidence of the people. Public officials must, therefore, avoid conduct which is in violation of their public trust or which creates a justifiable impression among the public that such trust is being violated.
[N.J.S.A. 52:13D-12(a).]
The Conflicts of Interest Law, which the SEC used in support of its decision, provides in pertinent part:
No State officer or employee or special State officer or employee should knowingly act in any way that might reasonably be expected to create an impression or suspicion among the public having knowledge of his acts that he may be engaged in conduct violative of his trust as a State officer or employee or special State officer or employee.
[N.J.S.A. 52:13D-23(e)(7).]
Pursuant to this requirement, the SEC adopted a regulation requiring state officials to recuse themselves from matters if they have a direct or indirect financial or personal interest that is incompatible with the discharge of the official's public duties. N.J.A.C. 19:61-7.4. This regulation, upon which the SEC also relied, states in pertinent part:
(c) A State official must recuse himself or herself from a matter if he or she has:
1. Any financial interest, direct or indirect, that is incompatible with the discharge of the State official's public duties; or
2. Any personal interest, direct or indirect, that is incompatible with the discharge of the State official's public duties.
(d) For purposes of (c) above, an incompatible financial or personal interest includes, but is not limited to, . . . any matter pertaining to or involving a relative or cohabitant . . . which interest might reasonably be expected to impair a State official's objectivity and independence of judgment in the exercise of his or her official duties or might reasonably be expected to create an impression or suspicion among the public having knowledge or his or her acts that he or she may be engaged in conduct violative of his or her trust as a State official.

*137 (e) An incompatible financial or personal interest may exist in other situations which are not clearly within the provisions of (c) and (d) above, depending on the totality of the circumstances. A State official should contact his or her agency ethics liaison officer or the Commission for guidance in such cases.
[Ibid. (emphasis added).]
In determining whether an appearance of impropriety exists, the Supreme Court has held:
The "appearance" of impropriety must be something more than a fanciful possibility. It must have some reasonable basis. However, where . . . a reasonable basis is shown to exist, "appearance" alone may be sufficient to present an ethical problem even though no actual impropriety exists.
[Higgins v. Advisory Comm. on Prof'l Ethics, 73 N.J. 123, 129, 373 A.2d 372 (1977).]
The question of appearance of impropriety was also recently reviewed by the Supreme Court in Thompson v. City of Atlantic, 190 N.J. 359, 921 A.2d 427 (2007). In Thompson, the Court reviewed the propriety of the decision of municipal officials to take part in the settlement of litigation against the City in which they were the adverse parties. Id. at 364, 921 A.2d 427. In concluding that these officials' actions were tainted by a clear conflict of interest, the Court defined the two public policy considerations involved in the analysis:
The primary purpose of conflict of interest laws is to ensure that public officials provide disinterested service to their communities and refrain from self-dealing. A secondary purpose is to promote confidence in the integrity of governmental operations.
[Ibid.]
The Court further emphasized that
[t]he citizens of every municipality have a vested right to the disinterested service of their elected and appointed officials, whose undivided loyalty must be to serve the public good. Public confidence requires that municipal officials avoid conflicting interests that convey the perception that a personal rather than the public interest might affect decision-making on matters of concern. Officials must be free of even the potential for entangling interests that will erode public trust in government actions. Thus, it is the potential for conflict, rather than proof of an actual conflict or of actual dishonesty, that commands a public official to disqualify himself from acting on a matter of public interest.

[Id. at 374-75, 921 A.2d 427 (emphasis added).]
In determining whether there is a reasonable basis to conclude that an appearance of impropriety exists, the court "adopts the perspective of an informed citizen." In re Opinion No. 653, 132 N.J. 124, 132, 623 A.2d 241 (1993); see also In re Determination of Executive Comm'n on Ethical Standards, 116 N.J. 216, 228, 561 A.2d 542 (1989) (holding that the court must look to how a "well-informed member of the public" might view the potential conflict).
Here, petitioner argues that the SEC's decision is erroneous in that it ignored the modifier "reasonably" in N.J.S.A. 52:13D-23(e)(7) and instead held that any possible appearance of impropriety, however nebulous, warrants disqualification of a BPU commissioner. We reject petitioner's characterization of the SEC decision.
We are satisfied that a disqualifying personal interest is present where a state official considers a case in which a close family member is involved. In Haggerty *138 v. Red Bank Borough Zoning Board of Adjustment, 385 N.J.Super. 501, 517, 897 A.2d 1094 (App.Div.2006), we reversed a decision of a local Board of Adjustment because the Board's vice-chairperson had a disqualifying conflict of interest. In that case, the vice-chairperson's father was of counsel to a law firm that had previously represented the applicant in the matter before the Board. Id. at 505-06, 897 A.2d 1094.
We specifically rejected the trial court's conclusion that the conflict was "remote and speculative," because the facts fell within the proscriptions in N.J.S.A. 40A:9-22.5d, which prohibits a government official from participating in any matter in which a member of his immediate family has a direct or indirect personal interest "that might reasonably be expected to impair his objectivity or independence of judgment." Id. at 514, 897 A.2d 1094. We thus concluded:
It does not matter, as defendants have urged, that Ms. Nicosia [the vice-chairperson of the Board] is an adult living her life independent of her family. Her independent status does not sever her family ties and thereby eliminate the conflict. . . . We consider the appearance of impropriety inherent in this relationship to be "something more than a fanciful possibility."
[Id. at 516-17, 897 A.2d 1094.]
We came to similar conclusions in Sokolinski v. Municipal Council of Woodbridge, 192 N.J.Super. 101, 105, 469 A.2d 96 (App.Div.1983), holding that certain members of a Board of Adjustment were disqualified from hearing variance applications for property owned by the local Board of Education, because these members were either employed by or married to individuals employed by the Board of Education. See also Barrett v. Union Twp. Comm., 230 N.J.Super. 195, 204, 553 A.2d 62 (App.Div.1989) (holding that a councilman was disqualified from participating in a zoning decision that affected the nursing home where his mother resided).
Here, as Chief of the Bureau of Rates and Tariffs, Ms. Bator reviews all matters assigned to her Bureau, and works with subordinate staff members to develop the Bureau's position. She makes all of the staff assignments, and manages and oversees their work. The Bureau's analysis of the case and its position are then discussed with the Assistant Director and the Director of the Division of Energy, and ultimately becomes the official position of the Division of Energy. The Division's position is presented to the Executive Director for review and approval. If approved, the Executive Director then incorporates the Division's position as part of the overall recommendations presented to the BPU when it formally considers an application or plan. These matters are disclosed to the public as agenda items; and considered and acted upon by the BPU in its official public sessions.
As this process demonstrates, Ms. Bator's role in matters assigned to her Bureau is not insignificant. Contrary to petitioner's characterization, she is not just "a technocrat in the classified civil service." Ms. Bator works directly on contested cases as a case manager, and supervises staff in developing the Bureau's position, which is part of the record considered by the Board in rendering its decision.
In this light, petitioner's participation in matters affected by her sister's professional involvement would reasonably create an impression with the public that petitioner's judgment as a member of the BPU may be tainted or at least influenced by personal considerations.
*139 Petitioner's reliance on Van Itallie v. Borough of Franklin Lakes, 28 N.J. 258, 146 A.2d 111 (1958) and Petrick v. Planning Board of Jersey City, 287 N.J.Super. 325, 671 A.2d 140 (App.Div.1996), is misplaced, because in those cases the public official's family member had a relatively minor position in the public entities involved. By way of example, in Petrick, residents of Jersey City brought an action challenging the planning board's approval of a site plan for a hospital parking garage. Id. at 328, 671 A.2d 140. The objectors argued that a board member had a conflict of interest, because his wife was an employee of the hospital at the time the site plan application was considered and voted upon by the planning board. Ibid.
In rejecting this argument, we noted that the board member's wife worked only occasionally at the hospital. We thus found that the relationship of the wife with the hospital was "too remote and too attenuated" to disqualify the board member from voting on the site plan application. Id. at 331-32, 671 A.2d 140. By contrast, petitioner's sister's role here is far from marginal. Ms. Bator not only has direct contact with the matters assigned to her Bureau, but she is also intimately involved in developing the position of the Bureau of Rates and Tariffs on those matters.

IV
Finally, petitioner argues that there is no conflict of interest because she and her sister both serve the same public interest in their official capacity. The cases cited by petitioner in support of this argument are inapplicable to the issue we confront here, because their holdings are predicated on different conflicts of interest rules.
Petitioner first relies on Executive Commission on Ethical Standards, supra, 116 N.J. 216, 561 A.2d 542. In that case, the Supreme Court considered the question of whether a Rutgers law professor conducting a clinical teaching program should be regarded as a "state employee" for the purposes of the Conflicts of Interest Law. Id. at 218, 561 A.2d 542. The question addressed was whether the professor could represent clients before the Council on Affordable Housing. Ibid.
The Court noted that "[t]he particular evil that occasioned the passage of the conflicts law was the appearance of impropriety by members of the official family of State Government representing interests before agencies of the very government with which they were associated." Id. at 220, 561 A.2d 542. The section of the Conflicts of Interest Law at issue in the case was N.J.S.A. 52:13D-16b, which states:
No State officer or employee . . . shall represent, appear for, or negotiate on behalf of, or agree to represent, appear for, or negotiate on behalf of, any person or party other than the State in connection with any cause, proceeding, application or other matter pending before any State agency.
The Court held that the professor was not to be regarded as a state employee for the purposes of this statutory provision, emphasizing the teaching role of the professor and the "unique status" of Rutgers University, which "occupied an essentially independent status" for some 190 years. Id. at 221-23, 29, 561 A.2d 542.
Petitioner also cites Opinion No. 653, supra, 132 N.J. at 126, 623 A.2d 241, in which the Court addressed the issue of whether partners in a law firm could simultaneously serve as County Counsel and as counsel to a County Vocational School Board. The Advisory Committee on Professional Ethics had determined that the arrangement created an inherent risk of conflict of interest and the appearance of *140 impropriety. Ibid. The Court held that because the interests of the School Board and the County were "rarely antagonistic," there was no conflict of interest present. Id. at 136, 623 A.2d 241.
The Court was specifically tasked with examining whether there was a violation of R.P.C. 1.7, which provides that "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client." Id. at 129-30, 623 A.2d 241. In this limited context, the Court found that the one attorney's representation of the School Board would not be directly adverse to the other attorney's representation of the County because the two entities had minimal contractual obligations or business transactions, and had never been involved in litigation with each other. Id. at 133-34, 623 A.2d 241.
Thus, both Executive Commission on Ethical Standards and Opinion No. 653 are distinguishable because they involve different conflict of interest provisions. Our task here is to examine how Ms. Bator's position as a senior BPU staffer affects petitioner's role as a member of the BPU. We examine this issue by applying the public policy considerations articulated by the Legislature in our State's Conflicts of Interest Law.
In this context, we affirm the opinion of the SEC, finding that petitioner had a disqualifying conflict of interest in matters in which her sister participated, as Chief of the Bureau of Rates and Tariffs, in developing the official position of the Division of Energy.
Affirmed.