963 A.2d 1224

WILLIAM RANDOLPH, PLAINTIFF–APPELLANT, v. CITY OF BRI-
GANTINE PLANNING BOARD, ROSE ROBERTS AND OCEAN
GOLD COAST, LLC, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued December 9, 2008—Decided February 6, 2009.

216

Before Judges WINKELSTEIN, GILROY and CHAMBERS.

*Anthony J. Sposaro,* argued the cause for appellant.

*Jack Plackter,* argued the cause for respondent Ocean Gold Coast, LLC (*Fox Rothschild, LLP,* attorneys; *Mr. Plackter,* of counsel and on the brief; *John P. Kaplan,* on the brief).

*Hance C. Jaquett,* argued the cause for respondents City of Brigantine Planning Board and Rose Roberts.

The opinion of the court was delivered by

WINKELSTEIN, P.J.A.D.

In this appeal, we address whether the conflict-of-interest principles embodied in the common law, the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D–1 to –163, and the Local Government Ethics Law (the Ethics Law), *N.J.S.A.* 40A:9–22.1 to –22.25, require a member of a planning board who has a personal relationship with, and owns a home jointly with, the principal of the engineering firm that employs the planning board engineer, to disqualify herself from applications in which the board's engineer reviews the application and provides recommendations to the board.

Plaintiff, William Randolph, appeals from the trial court's order affirming the Brigantine (the City) Planning Board's (the Board) approval of a preliminary site plan application for a proposed hotel on property owned by defendant Ocean Gold Coast (the applicant or defendant).[1] Plaintiff claims that the public notice of the Board's meetings was defective, depriving the Board of jurisdiction; that the Board's decision should be set aside because of a conflict of interest between the Board chairwoman and the Board's engineer; that the Board should have required a variance for parking; and that the Board did not have authority to consider

---

[1] The Brigantine Planning Board is a consolidated land use board created pursuant to *N.J.S.A.* 40:55D–25c.

the application before the applicant obtained approval from the City Council for a street vacation for a proposed stormwater management basin.[2]

Because we find merit to plaintiff's argument that the Board chairwoman had a perceived, if not actual, conflict of interest with the Board engineer, we reverse the trial court order affirming the Board's approval, set aside the approval, and remand to the Board.

I

Defendant is the owner of an undeveloped parcel of land consisting of approximately 49,000 square feet, located in the City's B–6 zoning district. The zone is a business use district that permits, among other uses, motels, retail trade establishments, restaurants, and parking lots. At the time of the Board hearings, a hotel was not listed in the ordinance as a permitted use.

In September 2006, defendant applied to the Board for preliminary and major site plan approval for a forty-two-room resort hotel with an indoor pool, on-site parking, and a bar and food service facilities. The application was reviewed by the Board's professionals. Among those professionals was Edward P. Stinson, P.E., an employee of the firm of Doran Engineering, P.A. In 2006 and 2007, the years in which the subject application was pending, Stinson had one-year contracts with the Board, which called for him to be paid for his services from the applicants' escrows, but the City would pay him a fee of $75.00 for each meeting he attended. Both contracts were between the Board and "Edward

---

[2] On appeal, plaintiff also initially challenged the Board's failure to require a use variance for the hotel and accompanying restaurant facilities. Plaintiff has abandoned those issues because the City subsequently amended its ordinances to make hotels permitted uses and to permit a restaurant and bar as accessory uses in the zone in which the property is located. *See Kruvant v. Mayor & Council of the Twp. of Cedar Grove*, 82 *N.J.* 435, 440, 414 *A.2d* 9 (1980) (pursuant to "time-of-decision" rule, appellate court on direct review will apply the statute in effect at the time of its decision).

P. Stinson, P.E., of the firm of Doran Engineering, P.A." On behalf of the Board, the 2006 contract was signed by Karen Bew, the vice-chair of the Board; the 2007 contract was signed by Rose Roberts, the Board chairwoman. Stinson signed each contract on his own behalf.

Under the terms of the contracts, Stinson agreed to "perform those engineering services as assigned and authorized to him for the Planning Board, including such advice and assistance to the Board Members and City's personnel, as may be required from time to time." Both contracts also contained the following language: "The parties intend that professional services to be rendered by Engineer to the Planning Board may be undertaken by Engineer through any qualified Engineer who is a partner, associate or agent in the firm of Doran Engineering, P.A."

The principals of Doran Engineering are Matthew Doran and his brother, Patrick. Matthew Doran (Doran) is a professional engineer; his brother provides accounting services to the firm. Defendant Roberts, the chairwoman of the Board, has a personal relationship with Doran and has lived with him for ten years. They own a home together. Doran is also the City zoning officer and was the Board engineer before Stinson was hired for that position. Doran left the position because he became the City building inspector. Roberts has been a Board member since 1981 and has been its chairperson since 1988. She acknowledged that reports generated by the Board's professional staff, including Stinson's, are given "a significant amount of weight" in the Board's analysis of an application.

According to Roberts, Stinson, not Doran, is the engineer who reviews applications and prepares the reports to the Board. Although Doran generally supervises Stinson's work for the engineering firm, the record does not reflect whether he supervises Stinson's work as the Board engineer. Roberts testified that she never discussed Ocean Gold Coast's application with Doran, but she did discuss with him that she was named as a defendant in the instant lawsuit.

Because the Board is a combined board, at times it is called upon to interpret the zoning ordinance. Roberts acknowledged that this presents a conflict for her with Doran in his capacity as the City zoning officer.

The Board held hearings on the application on December 13, 2006, and January 24, 2007.[3]  Roberts chaired the initial hearing. Approximately halfway through the hearing, which lasted over four hours, the Board voted six to three that a use variance was not needed to construct the hotel, including its accessory food service facilities.  Roberts participated in the proceedings and voted with the majority.  In allowing the application to proceed without the need for a use variance, the Board rejected Stinson's recommendation in his written report that a variance was necessary.  Prior to the vote, Stinson, who was present at the hearing, did not address the Board.

After the Board's vote, the applicant presented the testimony of its professionals, including an architect, a planner, and a real estate broker.  The Board also heard testimony from members of the public.  Stinson addressed the Board near the end of the proceeding on issues other than the necessity of a use variance for the hotel.  The Board did not decide the merits of the application at that meeting.

At the January 24, 2007 Board meeting, plaintiff objected to Roberts continuing to participate on the basis of her involvement with Doran.  Roberts recused herself, although she did not consider her relationship with Doran to be a conflict as to the subject application.  She therefore did not participate in the second hearing, at the conclusion of which the Board voted six to one to approve defendant's preliminary site plan application subject to a number of conditions, including one that required the applicant to obtain approval from the City to vacate a portion of Beach Avenue

[3] The transcript of the first hearing is, in many parts, indecipherable.  Rather than referring to the individual speakers, the transcript merely lists "council" as the individual speaking.

for a stormwater management basin. Stinson addressed the Board in substantial detail during the meeting before the Board voted, advising the Board where waivers were required and what conditions were necessary if the Board saw fit to grant the application. The Board memorialized its decision in a February 28, 2007 resolution.

Plaintiff filed a complaint in lieu of prerogative writs challenging the Board's approval. After the case was argued in the trial court, but before the court's decision, the City Council amended its zoning ordinance to include hotels as a permitted use in the zone, and it amended the definition of "restaurant" to read: "An establishment where food and drink is prepared for, and offered and sold to the general public, which food and drink is consumed primarily within the principal building." Prior to this amendment, the ordinance defined a restaurant simply as "an establishment where food and drink is prepared and consumed primarily within the principal building." As a result of the amendment, the food service facilities within the hotel proposed by the applicant did not constitute a "restaurant." The amendments were prepared by the Board planner after conferring with a committee that was composed of Roberts, Bew, Stinson, the Board solicitor, the City building inspector, the City zoning officer (Doran), and the fire chief. The full Board later adopted a resolution recommending the amendments.

On January 15, 2008, the trial court issued a written opinion and final judgment affirming the Board's approval.

## II

■ Against this factual and procedural setting, we turn to what we consider to be the dispositive issue on appeal: whether a conflict existed between Chairwoman Roberts and the Board's engineer so as to require the Board's approval to be set aside. Determining whether a conflict exists requires a case-by-case, fact-sensitive analysis. *Shapiro v. Mertz,* 368 *N.J.Super.* 46, 53, 845 *A.*2d 186 (App.Div.2004).

The MLUL provides that "[n]o member of the planning board shall be permitted to act on any matter in which he has, either directly or indirectly, any personal or financial interest." *N.J.S.A.* 40:55D–23b. In commenting on the breadth of *N.J.S.A.* 40:55–1.4, the predecessor to *N.J.S.A.* 40:55D–23b, which contains the identical disqualification language, we observed that the "statutory disqualification is markedly broadly couched, extending to personal as well as financial interest, 'directly or indirectly.'" *Zell v. Borough of Roseland,* 42 *N.J.Super.* 75, 81, 125 *A.*2d 890 (App.Div. 1956). The statutory bar "is not confined to instances of possible material gain[,] but . . . it extends to any situation in which the personal interest of a board member in the 'matter' before it, direct or indirect, may have the capacity to exert an influence on his action in the matter." *Ibid.*

This provision of the MLUL codifies the common-law rule that "[a] public official is disqualified from participating in judicial or quasijudicial proceedings in which the official has a conflicting interest that may interfere with the impartial performance of his duties as a member of the public body." *Wyzykowski v. Rizas,* 132 *N.J.* 509, 523, 626 *A.*2d 406 (1993) (quoting *Scotch Plains–Fanwood v. Syvertsen,* 251 *N.J.Super.* 566, 568, 598 *A.*2d 1232 (App.Div.1991)). In *Wyzykowski,* the Court outlined four situations that require disqualification: (1) "[d]irect pecuniary interests"; (2) "[i]ndirect pecuniary interests"; (3) "[d]irect personal interest"; and (4) "[i]ndirect personal interest." *Id.* at 525–26, 626 *A.*2d 406 (quoting Michael A. Pane, *Conflict of Interest: Sometimes a Confusing Maze, Part II,* New Jersey Municipalities, March 1980, at 8, 9.).

Under both the common law and the statutory bar expressed in *N.J.S.A.* 40:55–1.4, planning board members, in their quasi-judicial capacity, may not participate in evaluating an application in any matter in which their direct or indirect private interests may be at variance with the impartial performance of their public duty. *Aldom v. Borough of Roseland,* 42 *N.J.Super.* 495, 501, 127 *A.*2d 190 (App.Div.1956). As we explained,

> the question is whether the officer, by reason of a personal interest in the matter, is placed in a situation of temptation to serve his own purposes to the prejudice of those for whom the law authorizes to act as a public official. And in the determination of the issue, too much refinement should not be engaged in by the courts in an effort to uphold the municipal action on the ground that his interest is so little or so indirect.
>
> [*Id.* at 502, 127 *A.*2d 190.]

One court of this State has equated the standards governing the conduct of quasi-judicial municipal officials with those of judges, stating: "The need for unquestionable integrity, objectivity and impartiality is just as great for quasi-judicial personnel as for judges." *Kremer v. City of Plainfield,* 101 *N.J.Super.* 346, 352–53, 244 *A.*2d 335 (Law Div.1968).

Under the common law, "[i]t is fundamental that the public is entitled to have its representatives perform their duties free from any personal or pecuniary interests that may affect their judgment." *Barrett v. Union Twp. Comm.,* 230 *N.J.Super.* 195, 200, 553 *A.*2d 62 (App.Div.1989). In determining whether a conflict exists, "[t]he potential for psychological influences cannot be ignored." *Id.* at 201, 553 *A.*2d 62 (quoting *Twp. of Lafayette v. Bd. of Chosen Freeholders of the County of Sussex,* 208 *N.J.Super.* 468, 473, 506 *A.*2d 359 (App.Div.1986)). "[I]t is the mere existence of the interest, not its actual effect, which requires the official action to be invalidated." *Twp. of Lafayette, supra,* 208 *N.J.Super.* at 473, 506 *A.*2d 359. Whether a particular interest is sufficient to disqualify a public official is a factual determination that depends on the circumstances of the particular case; "[t]he question will always be whether the circumstances could reasonably be interpreted to show that they had the likely capacity to tempt the official to depart from his sworn public duty." *Van Itallie v. Franklin Lakes,* 28 *N.J.* 258, 268, 146 *A.*2d 111 (1958).

Notably, it is not simply the existence of a conflict that may be cause to overturn an action of a public official, but also the appearance of a conflict. As the Court has explained,

> Public confidence requires that municipal officials avoid conflicting interests that convey the perception that a personal rather than the public interest might affect decisionmaking on matters of concern. Officials must be free of even the potential

for entangling interests that will erode public trust in government actions. Thus, it is the potential for conflict, rather than proof of an actual conflict or of actual dishonesty, that commands a public official to disqualify himself from acting on a matter of public interest.

[*Thompson v. City of Atlantic City,* 190 *N.J.* 359, 374, 921 *A.*2d 427 (2007)].

One leading commentator phrases the standard for assessing the appearance of a conflict as follows: "Would an impartial and concerned citizen, intelligent and apprised of all the facts in the situation, feel that there was the potential for non-objectivity on the part of the officeholder making a decision? If the answer is affirmative the appearance of conflict exists." Michael A. Pane, Jr., New Jersey Practice Series, Vol. 34 Local Government Law § 9.4 (2007).

Nevertheless, the appearance of impropriety must be "something more than a fanciful possibility. It must have some reasonable basis." *Higgins v. Advisory Comm. on Prof'l Ethics of the Supreme Court of N.J.,* 73 *N.J.* 123, 129, 373 *A.*2d 372 (1977). The Court has observed that

[l]ocal governments would be seriously handicapped if every possible interest, no matter how remote and speculative, would serve as a disqualification of an official. If this were so, it would discourage capable men and women from holding public office.... [Courts] must also be mindful that to abrogate a municipal action at the suggestion that some remote and nebulous interest is present, would be to unjustifiably deprive a municipality in many important instances of the services of its duly elected or appointed officials.

[*Van Itallie, supra,* 28 *N.J.* at 269, 146 *A.*2d 111.]

As the *Wyzykowski* Court stated, a conflict does not exist unless "contradictory desires [are] tugging the official in opposite directions." *Supra,* 132 *N.J.* at 524, 626 *A.*2d 406 (quoting *LaRue v. Twp. of East Brunswick,* 68 *N.J.Super.* 435, 448, 172 *A.*2d 691 (App.Div.1961)).

These common-law principles have been supplemented by the Ethics Law. *Thompson, supra,* 190 *N.J.* at 375, 921 *A.*2d 427. According to the Ethics Law's legislative findings, it was enacted "to provide a method of assuring that standards of ethical conduct and financial disclosure requirements for local government officers and employees shall be clear, consistent, uniform in their application, and enforceable on a statewide basis...." *N.J.S.A.* 40A:9–

22.2e.  The statute declares that "[w]henever the public perceives a conflict between the private interests and the public duties of a government officer or employee, [public] confidence [in elected and appointed representatives] is imperiled." *N.J.S.A.* 40A:9–22.2c.  The act applies to both local government employees, meaning persons who are employed by or serve on a local government agency, *N.J.S.A.* 40A:9–22.3f, as well as local government officers, which include persons serving on local government agencies that have the authority to "approve development applications or grant zoning variances." *N.J.S.A.* 40A:9–22.3g.  Thus, both the Board engineer and the members of the Board are subject to the Ethics Law.

*N.J.S.A.* 40A:9–22.5 establishes a code of ethics for both government officers and employees.  It says, in part:

No local government officer or employee shall act in his official capacity in any matter where he, a member of his immediate family, or a business organization in which he has an interest, has a direct or indirect financial or personal involvement that might reasonably be expected to impair his objectivity or independence of judgment.

[*N.J.S.A.* 40A:9–22.5d.]

This statute refines the definition of a conflict of interest established in the common law.  *Shapiro, supra,* 368 *N.J.Super.* at 52, 845 *A.*2d 186.  Consequently, "[w]hen determining whether a conflict exists, we must look to the Ethics Law as well as to the common law and, when applicable, to the [MLUL]." *Ibid.* (citing Cox, *New Jersey Zoning and Land Use Administration,* § 3–1.2 at 42 (2004)).  As Judge King explained in *Shapiro,*

The Ethics Law expanded the definition of a conflict of interest which had been established through common law and codified by the MLUL, *N.J.S.A.* 40:55D–23b. Cox, § 3–1.2(e) at 46–47.  Instead of using the words "any personal or financial *interest,*" as used in the MLUL, the Legislature instead chose to utilize the words "financial or personal *involvement.*" *N.J.S.A.* 40A:9–22.5d (emphasis added).  Cox concludes that the word "involvement" extends the Ethics Law's reach beyond that of the MLUL and would appear to cover "such intangible relationships as friendship or being an alumnus of the same school of the applicant." *Ibid.*

[*Id.* at 53, 845 *A.*2d 186.]

In *Shapiro,* we were asked to determine whether a township committeewoman's vote for her husband's appointment to the

municipal planning board violated the local ethics ordinance or the Ethics Law. *Id.* at 49, 845 *A.2d* 186. In finding that "when a family member's vote results in another family member obtaining a position in a government agency ... a conflict is usually present," we focused on the public's perception that the committeewoman had "a personal interest in the reappointment of her husband to a prestigious and potentially very influential position." *Id.* at 54–55, 845 *A.2d* 186. We framed the question as "whether there existed an interest creating a potential conflict and not whether [the public official] yielded to the temptation." *Id.* at 55, 845 *A.2d* 186 (quoting *Barrett, supra,* 230 *N.J.Super.* at 204, 553 *A.2d* 62). We found that "in the eyes of the public, the personal involvement between [the committeewoman and her husband] may reasonably be expected to impair [the committeewoman's] objectivity or independence of judgment." *Ibid.* We concluded "that marriage is a direct personal involvement which might be reasonably expected to impair objectivity or independence of judgment within the meaning of *N.J.S.A.* 40A:9–22.5d." *Id.* at 56, 845 *A.2d* 186.

Applying these principles here, the issue is whether "the circumstances could reasonably be interpreted to show" that Chairwoman Roberts's relationship with Doran "had the likely capacity" to tempt her to depart from her sworn public duty, thus eroding confidence by the public that she would make her own independent judgment as to Ocean Gold Coast's application before the Board. *Wyzykowski, supra,* 132 *N.J.* at 523, 626 *A.2d* 406 (quoting *Van Itallie, supra,* 28 *N.J.* at 268, 146 *A.2d* 111). It is not necessary to establish that she did not exercise her independent judgment, it is only the potential that she may fail to exercise her judgment that need be shown. And that potential has been aptly demonstrated.

We readily acknowledge that the factual context in which the conflict issue arises is not typical of those in which courts have addressed conflict-of-interest claims against members of municipal boards. In general, the conflict, or perceived conflict, involves a

member of the board and the applicant, where the board member could gain, financially or otherwise, from either the approval or disapproval of the application. Our research has disclosed no case law involving a similar set of facts as presented here, where the alleged conflict does not directly implicate the applicant, but involves a board member and a board professional. We have, however, addressed a somewhat analogous situation in *In re Bator*, 395 *N.J.Super.* 120, 928 *A.*2d 132 (App.Div.2007), *certif. denied*, 193 *N.J.* 222, 936 *A.*2d 969.

There, a commissioner of the Board of Public Utilities, whose sister was a Board employee—the Chief of the Bureau of Rates and Tariffs—appealed to this court from a decision of the State Ethics Commission, which required the commissioner to recuse herself from matters before the Board that involved "her sister's work product or about which her sister [made] a presentation to the Board." *Id.* at 121, 928 *A.*2d 132. The Ethics Commission, in applying the New Jersey Conflicts of Interest Law, *N.J.S.A.* 52:13D–12 to –28, and its concomitant regulations, found that an appearance of impropriety would exist as a "member of the public could reasonably infer that the Board member's objectivity will be compromised." *Id.* at 124, 928 *A.*2d 132. The pertinent law and regulation provided:

> No State officer or employee ... should knowingly act in any way that might reasonably be expected to create an impression or suspicion among the public having knowledge of his acts that he may be engaged in conduct violative of his trust as a State officer or employee....
>
> [*N.J.S.A.* 52:13D–23(e)(7).]
>
> A State official must recuse himself or herself from a matter if he or she has:
>
> 1. Any financial interest, direct or indirect, that is incompatible with the discharge of the State official's public duties; or
>
> 2. Any personal interest, direct or indirect, that is incompatible with the discharge of the State official's public duties.
>
> [*N.J.A.C.* 19:61–7.4(c).]

We agreed with the Ethics Commission. *In re Bator, supra*, 395 *N.J.Super.* at 128, 928 *A.*2d 132. " '[A]dopt[ing] the perspective of an informed citizen' " to determine if "there is a reasonable basis to conclude that an appearance of impropriety exists," we

held that "a disqualifying personal interest is present where a state official considers a case in which a close family member is involved." *Id.* at 127–29, 928 *A.*2d 132 (quoting *In re Opinion No. 653,* 132 *N.J.* 124, 132, 623 *A.*2d 241 (1993)).

Although the controlling statute and regulations we relied on in *Bator* are only applicable to State rather than municipal officials, the disqualifying language of the statute and regulations is sufficiently similar to the language of *N.J.S.A.* 40:55D–23b and *N.J.S.A.* 40A:9–22.5 to call for an analogous inquiry here. If, from the perspective of an informed citizen, the independent judgment of a municipal officer may be influenced by her relationship with one of the board's professionals, "there is a reasonable basis to conclude that an appearance of impropriety exists." *In re Bator, supra,* 395 *N.J.Super.* at 127, 928 *A.*2d 132. And here, the public could perceive that Chairwoman Roberts's personal involvement with Doran could reasonably be expected to impair her objectivity and independence of judgment.

Roberts and Doran have been living together for ten years. They own a home together. Stinson is employed by the Board through a series of one-year contracts, the most recent of which Roberts signed on behalf of the Board. Those contracts not only call for Stinson to provide services for the Board, but also allow those services to be performed by any partner or associate of Doran Engineering, of which Doran is a principal. Doran generally supervises Stinson. Although the record is unclear, it is reasonable for the public to assume that his supervision may include the work Stinson does for the Board.

Doran is the City zoning officer, and before Stinson became the Board engineer, Doran held that position. It would not be unreasonable for a member of the public to assume that given Doran's extensive experience, Stinson may in fact discuss issues with him that directly affect Stinson's reports and advice to the Board. Roberts has acknowledged that reports generated by the Board's engineer are given significant weight in the Board's evaluation of an application; thus, a citizen could perceive that

Roberts's relationship with Doran could impair her independent judgment when considering Stinson's advice.

The public could also reasonably conclude that Roberts has a personal interest in the reappointment of Stinson as the Board's engineer, a prestigious and potentially lucrative position, as that reappointment would benefit Doran's engineering firm. In other words, an informed citizen may reasonably conclude that in light of her relationship with Doran, Roberts may be tempted to support and approve Stinson's opinion in an effort to encourage the Board to reappoint Stinson and Doran's engineering firm.

We are mindful that although Stinson recommended that a variance would be necessary to construct a hotel in the subject zone, Roberts voted with the majority in finding that no such variance was required. The question is not, however, whether Roberts yielded to a temptation to have her judgment impaired, but rather whether, "in the eyes of the public," her personal involvement with Doran could reasonably be expected to impair her objectivity or independence. *Shapiro, supra,* 368 *N.J.Super.* at 55, 845 *A.*2d 186. Although Roberts and Doran are not married, their intimate personal involvement might reasonably be expected to impair Roberts's objectivity or independence of judgment under the principles espoused in the common law, the MLUL, and particularly the Ethics Law.

We have also considered that Roberts did not participate in the second hearing, at which time the dispositive vote was taken on the application. Nonetheless, she chaired and actively participated at the first hearing, when not only was a vote taken with regard to whether or not variances were necessary for hotel or restaurant uses, but it was during that initial proceeding that the applicant presented the testimony of a number of expert and lay witnesses, and members of the public testified.

In sum, because of Roberts's participation at the December Board hearing, the Board proceedings in their entirety must be voided and set aside. *See Haggerty v. Red Bank Borough Zoning Bd. of Adj.,* 385 *N.J.Super.* 501, 516–17, 897 *A.*2d 1094 (App.Div.

2006) (setting aside decision of board of adjustment because of impermissible conflict of interest on part of the board's presiding officer).

We make one final observation regarding the conflict-of-interest issue. We recognize that our opinion could "reduce the number of qualified persons ... willing to serve on local boards" in small municipalities. *Gunthner v. Planning Bd. of Bay Head,* 335 *N.J.Super.* 452, 457, 762 *A.*2d 710 (Law Div.2000) (quoting Assembly Local Government Committee Statement, Assembly No. 826, Sept. 29, 1994). Yet, in reconciling the competing public interests at stake, the need for unfettered objectivity by planning board members outweighs the potential difficulties small municipalities may experience in attracting people to serve on local boards.

### III

Given our determination to set aside the Board's approval based on Roberts's perceived conflict-of-interest, we do not address plaintiff's claim that defendant's notice was defective. New notices will be necessary if defendant renews its application. We will, however, address plaintiff's claim that a variance for parking spaces was required, and that the applicant was required to seek a street vacation for a proposed stormwater management basin before applying for site plan approval. As did the trial judge, we reject these arguments.

The ordinance at issue requires one parking space per single room unit; one space per bedroom for suite units; one space per employee intended to be on the premises; one parking space per 100 square feet of restaurant space; and one space per two restaurant employees. The applicant proposed sixty parking spaces: thirty-four spaces for the thirty-four one-bedroom units; sixteen spaces for the eight two-bedroom units; and nine spaces for the nine employees. Plaintiff contends that an additional nine spaces is required for the restaurant/bar. We disagree.

The ordinance provides that:

> The Planning Board may take into account potential joint use of the facilities by guests, between principal uses and accessory uses, in determining the maximum required spaces for any motel or hotel facility. In making such determination, the Planning Board and the applicant should take into account the reasonable requirements of the operation of a proposed motel or hotel, of the type presented to the Board and the impact upon the surrounding uses to ensure that sufficient parking exists such that the proposed use will not adversely impact adjoining neighborhoods or access to the beach, dunes or other recreation areas.

Addressing the parking issue in light of the ordinance, the trial court concluded:

> [T]he food and beverage service does not constitute a full fledged restaurant and bar, but will only provide such ancillary service to the hotel guests, and will not be open to the public. The Ordinance specifically provides the Board with the authority and flexibility to take into account the joint use of facilities by guests as between principal uses and accessory uses in determining the maximum number of parking spaces required for a hotel or motel facility. Such flexibility permits the Board to address the parking as it relates to Ocean Gold's proposal to provide food and beverage service to its hotel guests only. It is undisputed that Ocean Gold will provide enough parking spaces for its hotel guests as required by the Ordinance. As to the impact of the food and beverage service on the need for off-street parking, there is no basis for this court to overturn the discretion exercised by the Board in approving 60 parking spaces for the proposed hotel.

Given that the restaurant and bar facilities are not open to the public, thus not within the ordinance's definition of "restaurant" or "bar," and that the Board has the authority to consider potential joint uses of the principal and accessory uses of a proposed hotel in determining the required number of parking spaces, we agree with the trial court's conclusion that the Board did not err in its approval of sixty parking spaces without the need for a variance.

■ Next, we consider plaintiff's argument that the Board did not have authority to consider the site plan application before the applicant obtained City Council's consent to vacate the public right of way for the proposed drainage system. That argument is without merit.

■ *N.J.S.A.* 40:55D–22b provides: "In the event that development proposed by an application for development requires an approval by a governmental agency other than the municipal agency, the municipal agency shall, in appropriate instances, condition its approval upon the subsequent approval of such governmental agency...." Courts favor the grant of preliminary approv-

al of development applications conditioned upon the applicant securing necessary property rights. *See W.L. Goodfellows and Co. of Turnersville, Inc. v. Washington Twp. Planning Bd.,* 345 *N.J.Super.* 109, 117–18, 783 *A.*2d 750 (App.Div.2001).

Here, the Board specifically conditioned its site plan approval on defendant's "[a]pplication to and approval by Brigantine City Council for the proposed vacation of a portion of Beach Avenue and the location of the proposed stormwater management basin." The Board's decision to grant approval subject to that condition was consistent with both the statute and the case law.

Plaintiff's remaining arguments related to the parking space issue and the street vacation issue are without sufficient merit to warrant discussion in a written opinion. *R.* 2:11–3(e)(1)(E).

IV

The Board's approval of Ocean Gold Coast's application for site plan approval, and the order of the Law Division affirming the Board's approval, are reversed. We remand to the Board for further proceedings consistent with this opinion.