NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0263-17T1

CENTRAL 25, LLC,

      Plaintiff-Appellant,

v.

ZONING BOARD OF THE CITY
OF UNION CITY,

      Defendant-Respondent.

_____

> **APPROVED FOR PUBLICATION**
>
> **July 24, 2019**
>
> **APPELLATE DIVISION**

Argued November 28, 2018 – Decided July 24, 2019

Before Judges Fuentes, Accurso and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-1246-16.

Ronald H. Shaljian and Seth I. Davenport argued the cause for appellant (Shumann Hanlon, LLC, attorneys; Ronald H. Shaljian, of counsel; Seth I. Davenport and Joseph Elmo Cauda, Jr., on the brief).

Gregory F. Kotchick argued the cause for respondent (Durkin & Durkin, LLC, attorneys; Gregory F. Kotchick, of counsel and on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

In Piscitelli v. City of Garfield Zoning Bd. of Adjustment, 237 N.J. 333 (2019), our Supreme Court recently addressed and clarified the standards governing disqualifying conflicts of interests for municipal planning and zoning board members and officials. Writing for the Court, Justice Albin explained that members of these municipal boards must be "free of conflicting interests that have the capacity to compromise their judgments." Id. at 338. Applying the Court's reasoning in Piscitelli, we hold that plaintiff presented sufficient evidence to establish reasonable grounds to question the impartiality of two members of the Union City Zoning Board of Adjustment (Board). Under the circumstances presented here, the Law Division erred in failing to conduct an evidentiary hearing to determine whether these two Board members should have been barred from hearing plaintiff's application for a use variance because their personal interests might reasonably be expected to impair their objectivity or independence of judgment.

We derive the following facts from the record developed before the Board and the Law Division.

I

In 2001, Manuel Alvarez rented a commercial space located at the 2400 block of Bergenline Avenue in Union City, and began operating Panorama Live

Poultry Market Corp. Mr. Alvarez lost his sight "in a tragic accident" in 2003, causing his wife Niurka Alvarez to take over the day-to-day operation of the business. The business operated at this location until 2014, when the landlord raised the rent. In February 2015, the Alvarezes found a property for sale at the 2500 block of Central Avenue in Union City (City), that they thought was suitable to relocate the business. This area of the City, however, is zoned for residential use. Thus, to make the relocation possible, the Alvarezes needed to secure a use variance.

According to Mr. Alvarez, the seller initially was not willing to provide an open-ended "zoning contingency" clause in the purchase contract because "there was another person bidding on the property." To secure a two-month "investigation" contingency, Mr. Alvarez agreed to pay $50,000 over his initial offer, for a total purchase price of $685,000. Mr. Alvarez testified that at the time he made this decision, he was aware that: "I needed to make sure that I was going to have the blessing by the Mayor."

On March 5, 2015, Mr. Alvarez and his wife Niurka met with Mayor Brian P. Stack[1] and Alex Velazquez, the head of the City's Health and Housing

---

[1] Mayor Stack is also a State Senator who represents the 33rd Legislative District.

A-0263-17T1

Department. According to Mr. Alvarez, this was the "one day in the week that [Mayor Stack] receive[s] people to listen to their problems." Mr. Alvarez told Mayor Stack that the owner of the property where his business was located on Bergenline Avenue had raised the rent from $2100 to $3800 per month. He told the Mayor he was unable to remain in business paying this much rent. Fortunately, he found a suitable property for sale located on Central Avenue and 25th street, only two blocks from his current location. This was within walking distance of ninety percent of his customers. Mr. Alvarez testified he emphasized to the Mayor this was a larger one-story standalone structure with "good . . . ventilation."

Mr. Alvarez testified that the Mayor told him this "was not his decision. It was up to the . . . Zoning Board members, but that he had no objections." According to Mr. Alvarez, the Mayor asked Velazquez for his opinion on the matter. In response, Velazquez allegedly characterized the project as a "magnificent idea" because the building was a corner property, with good ventilation, and "no apartments above." Mr. Alvarez testified that he left the Mayor's office "with the feeling that I have his blessing, and with the confidence

that we could go out and ask for the loan[2] to buy the property." The appellate record includes a printed copy of an email Mrs. Alvarez sent to Mayor Stack dated March 6, 2015, memorializing what she claims was discussed at the meeting the previous day. The Alvarezes formed Central 25, LLC to hold the title of the property and listed themselves as the only principals. They closed title on June 18, 2015.

On September 4, 2015, Central 25, LLC submitted an application to the Board for preliminary and final site plan approval, which required a number of bulk variances and a use variance to operate two retail uses: (1) a fish market; and (2) a live poultry market. The application was originally scheduled to be heard on October 15, 2015. At plaintiff's request, the hearing was adjourned to November 12, 2015, to accommodate its planner's scheduling conflict. According to plaintiff's counsel, on that same day, the Board's attorney recused himself "presumably because his family owns the building where [the Alvarezes'] existing poultry market is located."

Plaintiff's counsel apprised the Board that on November 7, 2015, the Alvarezes invited area residents to attend a neighborhood meeting at the Central

---

[2] In his introductory remarks to the Board at the December 10, 2015 meeting, plaintiff's counsel claimed the Alvarezes mortgaged their home to finance the purchase of the Central Avenue property.

A-0263-17T1

Avenue property "to address concerns that they may have." Counsel claimed that at this gathering, "one of our client's customers produced two letters, over Mayor Stack's signature, [written] in both Spanish and English, which had been slipped under the doorway of her home on official Union City stationery." The letters were marked as exhibits at the Board hearing and are part of the appellate record.

The letters are not dated; they are written on paper embossed with the seal of the City of Union City, identify an affiliation with the Department of Public Safety, and list the City Hall as its address. "Brian P. Stack, Mayor" is printed on the top left corner of the letter; the right corner lists the Mayor's Office telephone and fax numbers. The content of the letter is formatted as a flyer; it states the following message written in large capital letters, using fonts of different sizes. We recite the content of the flyer verbatim:

<u>Please Read Correction to previous flyer!</u>[3]

---

[3] The record before us includes two letters/flyers written in Spanish. In response to a question from a member of the Board, plaintiff's counsel asserted that the Spanish language version of the first letter reflects that Mayor Stack "was in favor" of the proposal to construct a live poultry market located on 25th Street and Central Avenue. According to plaintiff's counsel, "a subsequent letter appeared with the Mayor's signature" correcting this mistake. Although the appellate record contains copies of the letters written in Spanish, plaintiff did not provide this court with a certified translation of these documents.

RESIDENTS IN THE AREA OF 25TH STREET & CENTRAL AVENUE

Dear Friend,

I am writing this letter to inform you that **I am personally not in favor of the live poultry market that is proposed for 25th Street and Central Avenue.** This is not something I believe would benefit or improve your neighborhood. I know you see, first hand, how hard and how diligent the Commissioners and I are working to improve your neighborhood and the City.

All I ask is if you can attend the meeting on November 12th at 6:00 PM at City Hall – 2nd Floor at 3715 Palisade Avenue. It is important to voice your opinion and concerns. I do not have a vote on the board that will hear this proposal so it is important for you to let your voice be heard.

Thank you for your dedication to your neighborhood the love we share for Union City (sic). As always, call me anytime – 7 days a week – if I can help. It is an honor to serve as your Mayor.

> Your friend,
> Brian P. Stack
> Mayor
> Cell: [contains a telephone number.]

Without a citation to the appendix[4], plaintiff's counsel states that on November 17, 2015, he received a letter from Board Secretary Carlos Vallejo advising him that the location of the Board meeting to hear plaintiff's application

---

[4] Pursuant to Rule 2:6-2(a)(5), all factual claims on appeal must be supported "by references to the appendix and transcript." Although counsel's statement is reflected in the transcript of the hearing before the Board, appellate counsel should have included a copy of the Board Secretary's November 17, 2015 letter as part of the appendix.

A-0263-17T1

had been changed to Robert Waters Elementary School, located at 2800 Summit Avenue. The hearing date was also changed to December 10, 2015. Vallejo directed plaintiff's counsel to send notice of this new date and location, as required by N.J.S.A. 40:55D-12.

Plaintiff's counsel marked as an exhibit before the Board an additional undated flyer[5] sent from Mayor Stack on official City stationery, addressed to the "RESIDENTS IN THE AREA OF 25TH STREET & CENTRAL AVENUE," in which the Mayor reaffirmed his condemnation of plaintiff's application. The Mayor also exhorted the area residents "to attend the meeting on December 10th at 6:00 PM at Robert Waters Elementary School . . . to voice your opinion and concerns."

The Board's Vice Chairman Victor Grullon made the following comments concerning the Mayor's flyers:

> I just want to clarify for the members of the Board that we don't - - we don't consider any letter of anybody that is not present in the - - in the audience here, to defend themselves.
>
> If you have a letter, and you want to - - for that letter to stay in the record, that person has to be present.

---

[5] This letter/flyer includes a photograph of the Mayor with the City's seal embossed above it.

A-0263-17T1

With that said, we don't consider any letter that you have, or any propaganda. It's probably an opinion of a resident of Union City, but we don't consider that as anything that will guide our decisions here.

In response to Vice-Chairman Grullon's statement, plaintiff's counsel noted that "the Mayor and Commissioners appoint each of the members of the Zoning Board." This prompted the following exchange by the attorneys:

BOARD ATTORNEY: Counsel? Counsel? Counsel? This is an independent body. Client just testified that he knew that this is an independent body . . . that has to make the decision. I would tread softly on what you say next.

PLAINTIFF'S ATTORNEY: And the Mayor's letter, all of the Mayor's letters, were sent out intentionally to enflame this application.

BOARD ATTORNEY: Counsel, again - -

PLAINTIFF'S ATTORNEY: And sabotage - -

BOARD ATTORNEY: Counsel, I don't - -

PLAINTIFF'S ATTORNEY: - - this application.

BOARD ATTORNEY: The Mayor's not here to testify and he's a resident of the town. Any one of these residents can contact - -

PLAINTIFF'S ATTORNEY: The letter was in his official capacity, counsel. It wasn't a letter from a private citizen.

. . . .

BOARD ATTORNEY:  - - and I think - - what I think - - I think what . . . the Chairman was saying is it doesn't really affect us.

. . . .

It doesn't really affect this body.

And whether . . . the Mayor was for it or against it, they don't - - it's not for their - - it's not for their ears.[6]

In addition to the Alvarezes' testimony, plaintiff presented the testimony of a licensed architect, an Animal Health Technician employed by the New Jersey Department of Agriculture, Division of Animal Health, a licensed professional engineer, an architect who specialized in environmental services and indoor air purification systems, and a licensed professional engineer and planner.  Because the focus of our review is limited to ethical considerations, we have opted not to summarize their testimony.

Eleven members of the public testified during the Board's public session. At the conclusion of the public comment session, Vice-Chairman Grullon moved to deny the application "because it's going to change the characteristic of the

---

[6] The record also includes copies of anonymous flyers condemning the proposed live poultry store and characterizing the Alvarezes as "some out-of-towners [who] want to open a live poultry market that they would never allow to open in their own town."  These flyers were also written in Spanish.  There is no evidence to indicate these flyers were prepared or distributed by the Mayor or anyone acting on his behalf.

A-0263-17T1

neighborhood, established residential zone and we . . . are here to respect the Zoning Ordinance."  Without further discussion or comment, six members voted to deny the application and one voted to grant it.  At the time the application came before the Board for a vote, Board member Margarita Gutierrez was the Chief Executive Officer (CEO) of the Brian Stack Civic Association (Association) and Vice-Chairman Grullon was its Vice-President.

II

On March 21, 2016, plaintiff filed this action in lieu of prerogative writs challenging the Board's decision pursuant to Rule 4:69-6(b)(3).  The judge originally assigned to hear this matter held a case management conference on June 13, 2016, as required by Rule 4:69-4 and established the parties' briefing schedule.  This judge thereafter recused himself based on a conflict of interest, the nature of which was not disclosed on the record.  The case was reassigned to a different judge who heard oral argument November 9, 2016.

Plaintiff argued the Board's decision denying the application should be reversed because: (1) the decision was arbitrary and capricious; (2) the resolution memorializing the denial of the application did not include "findings of fact and conclusions based thereon" as required by N.J.S.A. 40:55D-10(g); and (3) the Mayor's improper interference in the application process irreparably

A-0263-17T1

tainted the Board's impartiality and denied plaintiff a fair hearing. With respect to the Board's impartiality, plaintiff's counsel noted that at the time of the hearing, Vice-Chairman Grullon, Board member Gutierrez, and the Board's Secretary Carlos Vallejo "were all officers and trustees of the Brian Stack Civic Association."

Plaintiff argued these individuals should have disclosed their membership and participation in the Association and thereafter recused themselves because the Mayor's campaign against the application created an impermissible conflict of interest. The judge initially decided that the Board's memorializing resolution was deficient "because it did not give enough facts for their basis for the denial, and a great deal of those statements were conclusions without enough facts." However, the judge rejected plaintiff's argument based on a conflict of interest by the two members of the Board who were listed as directors of the Mayor's Association. The judge provided the following explanation to support of his decision:

> Plaintiff also contends that Mayor Stack's Civic Association is a tool used to secure Mayor Stack's alleged political stronghold in Union City.
>
> While the issue is not - - those statements are without evidentiary support.

A-0263-17T1

Plaintiff has specifically acknowledged that he does not have personal knowledge as to the allegations made in regard to the Mayor's Civic Association.

Moreover, plaintiff has not submitted a certification in support of the same, yet plaintiff asks the [c]ourt to infer improper behavior on behalf of the Mayor because of his Civic Association, essentially, and its influence, citing the donation of turkey baskets or candies for seniors, but there is no evidence of wrongdoing or improper behavior on behalf of the Civic Association, and it specifically fails to show that the alleged behavior has somehow tainted the Union City Zoning Board.

. . . .

In addition, the plaintiff asserts that there are various conflicts of interest between the Board and Mayor Stack because three[7] members of the Zoning Board of Adjustment are members of Mayor Stack's Civic Association.

But the [c]ourt is unconvinced that being merely members of an association or a political organization would disallow someone from being a member of a . . . Board such as the Board of Adjustment, the Library Board, the Rent Leveling Board, et cetera.

Therefore, the accusations lack merit, and the [c]ourt is unpersuaded that the Board is so irreparably tainted by Mayor Stack's influence, as to render a fair decision.

---

[7] Only Grullon and Gutierrez are members of the Board. Secretary Vallejo, who is listed as a director of the Mayor's Association, is not a member of the Board. He is employed by the City to serve as Secretary to the Board.

A-0263-17T1

In an order dated November 28, 2016, the court remanded the matter for the Board to adopt "a memorializing resolution setting forth more specific findings and conclusions of law" within forty-five days. In response to the court's order, the Board passed a "Revised Resolution" on January 12, 2017, on a vote of four to zero with two absent. In an order dated April 4, 2017, the trial judge established a new briefing schedule and directed the parties to appear on June 16, 2017, to present oral argument.

On the day of oral argument, plaintiff's counsel argued that the Revised Resolution remained deficient. Counsel characterized the first eleven pages of the resolution as "merely a regurgitation of a summary of the transcript." He also noted that the resolution does not "evaluate, question, [or] reject . . . the testimony of plaintiff's experts in this matter." According to plaintiff's counsel, the Board used "boilerplate language" in lieu of actual fact-finding. Counsel urged the judge "to take a very hard look" because, in his opinion, the Board had once again failed to carry out its fact-finding statutory duty. The Board's attorney argued the Revised Resolution fully responded to the court's earlier ruling and contained the required factual findings. The judge reserved decision at the end of oral argument.

A-0263-17T1

In an oral decision delivered from the bench on July 27, 2017, the judge found no grounds to disturb the Board's decision and dismissed plaintiff's cause of action with prejudice. Although the testimony of plaintiff's experts was not challenged, the judge held the Board was not obligated to accept their findings and opinions. The judge entered a final order on August 8, 2017, memorializing his decision.[8]

## III

We start our analysis with Justice Albin's cautionary proclamation in Piscitelli: "Public confidence in the integrity of our municipal planning and zoning boards requires that <u>board members be free of conflicting interests that have the capacity to compromise their judgments</u>." 237 N.J. at 338 (emphasis added). Thus, the question here is not whether Mayor Stack attempted to unduly influence the Board's evaluation of this application. What we are required to

---

[8] Although not raised by the parties or noted by the trial judge in his oral opinion, we are compelled to point out the following irregularity. The second Revised Resolution dated January 12, 2017 was signed by Board Chairman Andres Garcia. The transcript of the December 10, 2015 Board meeting lists Chairman Garcia as "absent" at that meeting. Thus, the resolution denying plaintiff's application was signed by Vice-Chairman Grullon, who presided at the meeting. The appellate record does not include a transcript of the January 12, 2017 Board meeting, at which the Board presumably passed the final "Revised Resolution." On remand, the Law Division must determine whether Chairman Garcia was legally competent to vote and sign the final Revised Resolution pursuant to N.J.S.A. 40:55D-10.2.

determine is whether any <u>members</u> of the Board who voted to deny this application had a personal interest that "might reasonably be expected to impair [their] objectivity or independence of judgment." <u>Ibid.</u> (citing N.J.S.A. 40A:9-22.5(d); N.J.S.A. 40:55D-69; N.J.S.A. 40:55D-23(b)).

Here, the record shows that Board member Margarita Gutierrez was the CEO of the Brian Stack Civic Association and Vice-Chairman Victor Grullon was its Vice President. The record also shows that Mayor Stack actively campaigned against plaintiff's application to obtain a variance from the Board to operate a live poultry market in a residential zone. Based on these uncontested facts, we hold the trial judge erroneously framed the dispositive question. The issue here is not: Did plaintiff present sufficient evidence to show that <u>the Board's</u> judgment as a whole was irreparably tainted by Mayor's Stack's activities? The Mayor, as an elected public official and a resident of the City, had the right to express his opinion on this proposed project. The question we must answer here is: Were the two members of the Board who held high ranking positions in a highly visible, public civic association which bears the Mayor's name, barred from voting on this application? As was the case in <u>Piscitelli</u>, the record before us is not sufficient to definitively answer this question.

In Piscitelli, members of a prominent family in the City of Garfield submitted an application to the Garfield Board of Adjustment for site plan approval and variances to construct a gas station, car wash, and other related car services on three lots. 237 N.J. at 338. As framed by the Court, the issue was "whether any members of the Garfield Zoning Board of Adjustment had a disqualifying conflict of interest because of the involvement of certain Conte family members in the Zoning Board proceedings." Ibid. The three members of this prominent family who owned these lots were all physicians.

One of the doctors had also served as a member of the Garfield Board of Education for many years, and was its president at the time the site plan application came before the Zoning Board. Id. at 339. Five members of the Zoning Board were employed by the Board of Education or had immediate family members who worked for the school district. Ibid. To avoid an appearance of a conflict, the owners of the lots made a series of intra-family transfers of title. Thereafter, the doctor, who also served as the president of the Board of Education, attended the Zoning Board hearing "and made clear his position favoring the project." Ibid.

Two objectors to the application addressed the Zoning Board and noted that the doctor, as President of the Board of Education, voted on personnel

17

matters. Ibid. Therefore, the five Zoning Board members who were employed or had immediate family members employed by the Board of Education had a conflict of interest that barred them from hearing the application. Ibid. These objectors also claimed that any member of the Zoning Board who was a patient or had immediate family members who were patients of this doctor or his brother were equally barred from voting on the outcome of this application. Ibid. However, none of the Zoning Board members disqualified themselves on conflict-of-interest grounds. Ibid. The Zoning Board approved the application and granted all of the necessary variances. Ibid.

The objectors filed an action in lieu of prerogative writs arguing the failure of the Zoning Board members to recuse themselves based on this conflict of interest "undermined the legality of the proceedings." Ibid. The trial court not only upheld the Zoning Board's decision "finding that no conflicts of interest had impaired the Board members[,]" but it also denied the objectors' request to determine whether any Zoning Board members or their family members were patients of the President of the Board of Education, his brother, or his nephew. Ibid. This court affirmed the trial court's decisions. Id. at 340.

The Supreme Court reversed and remanded the matter "for further proceedings to decide whether any Zoning Board member had a disqualifying

conflict of interest in hearing the application[.]" Ibid. The Court gave the trial

court the following instructions:

> The trial court must assess two separate bases for a potential conflict of interest. First, did [the doctor] . . . as president or a member of the Board of Education -- have the authority to vote on significant matters relating to the employment of Zoning Board members or their immediate family members? Second, did any Zoning Board members or an immediate family member have a meaningful patient-physician relationship with any of the three . . . doctors? If the answer to either of those questions is yes, then a conflict of interest mandated disqualification and the decision of the Zoning Board must be vacated. We do not possess sufficient information to answer those questions. We therefore reverse the judgment of the Appellate Division and remand to the trial court to determine whether any disqualifying conflicts impaired the Zoning Board proceedings.
>
> [Ibid.]

In reaching this conclusion, the Court in Piscitelli emphasized and

reaffirmed that the overarching purpose of conflict of interest laws are: (1) "to

ensure that public officials provide disinterested service to their communities;"

and (2) to "promote confidence in the integrity of governmental operations." Id.

at 349 (quoting Thompson v. City of Atlantic City, 190 N.J. 359, 364 (2007)).

The Court identified the following three "distinct" sources of authority to

determine whether zoning board members have a disqualifying conflict of

interest that require their recusal: (1) the Local Government Ethics Law, N.J.S.A. 40A:9-22.2; (2) the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-69; and (3) the common law, which, although now codified in those conflict statutes, remains a useful tool of construction in those cases requiring judicial oversight. Id. at 350.

The Local Government Ethics Law defines a "local government officer" as a person "serving on a local government agency which has the authority to enact ordinances, approve development applications or grant zoning variances[.]" N.J.S.A. 40A:9-22.3(g)(2). The statute also provides that:

> No local government officer or employee shall act in his official capacity in any matter where he, a member of his immediate family, or a business organization in which he has an interest, has <u>a direct or indirect financial or personal involvement that might reasonably be expected to impair his objectivity or independence of judgment</u>;
>
> [N.J.S.A. 40A:9-22.5(d) (emphasis added).]

In the following passage in Piscitelli, Justice Albin dispelled any ambiguity that may have existed about the scope of the ethical standards the Legislature imposed to govern the conduct of local government officers:

> In enacting this code of ethics for municipal officers and employees, the Legislature declared its intent by stating:

> a. Public office and employment are a public trust;
>
> b. The vitality and stability of representative democracy depend upon the public's confidence in the integrity of its elected and appointed representatives;
>
> c. Whenever the public perceives a conflict between the private interests and the public duties of a government officer or employee, that confidence is imperiled.
>
> [Id. at 351 (quoting N.J.S.A. 40A:9-22.2(a) to (c)).]

Of particular relevance to the case before us, Justice Albin emphasized that proper judicial oversight requires judges to construe N.J.S.A. 40A:9-22.5(d) in a manner that "further[s] the Legislature's expressed intent that '[w]henever the public perceives a conflict between the private interests and the public duties of a government officer,' 'the public's confidence in the integrity' of that officer is 'imperiled.'" Ibid. (Emphasis added).

However, this code of ethics is not the only law that regulates the conduct of members of zoning boards. The MLUL describes the composition of the zoning board of adjustment, sets strict eligibility standards on who may be appointed to serve as a member, and describes what type of conduct or personal interest may disqualify a member from deciding a particular application.

21

Specifically: "No member of the board of adjustment shall be permitted to act on any matter in which he has, either directly or indirectly, any personal or financial interest."  N.J.S.A. 40:55D-69 (emphasis added).

As Justice Albin noted in Piscitelli:

> The overlapping conflict-of-interest codes that apply to this case can be distilled into a few common-sense principles. A citizen's right to "a fair and impartial tribunal" requires a public official to disqualify himself or herself whenever "the official has a conflicting interest that may interfere with the impartial performance of his duties as a member of the public body."  The question is not "whether a public official has acted dishonestly or has sought to further a personal or financial interest; the decisive factor is 'whether there is a potential for conflict.'"  "The question will always be whether the circumstances could reasonably be interpreted to show that [conflicting interests] had the likely capacity to tempt the official to depart from his sworn public duty."
>
> A conflict of interest arises whenever a public official faces "contradictory desires tugging [him or her] in opposite directions."  This objective inquiry into whether a disqualifying conflict is present dispenses with any probing into an official's motive because the ultimate goal is to ensure not only impartial justice but also public confidence in the integrity of the proceedings.
>
> [237 N.J. at 352-53 (emphasis added) (citations omitted).]

Guided by these ethical standards, we are satisfied the record developed before the Board does not provide sufficient information to determine whether the circumstances surrounding Board member Gutierrez's and Vice-Chairman Grullon's membership in and relationship with the Brian Stack Civic Association and Mayor Stack's active opposition to plaintiff's application could reasonably be construed to show a likely capacity to tempt the officials to depart from their sworn public duty at the time they voted to deny plaintiff's application. Piscitelli, 237 N.J. at 353.

It is undisputed that Mayor Stack actively campaigned against plaintiff's application, disseminated flyers that expressed his opinion on the matter, and urged area residents to attend the Board meeting and testify against the application. The record also shows that at the time the application came before the Board, Gutierrez was the CEO of the Civic Association that bears the Mayor's name and Grullon was its Vice-President.

The Law Division judge did not consider the ethical implications of this information. The high-level of participation in the Mayor's Association by these two Board members might reasonably be viewed by the applicant and the public at large as significant factors capable of impairing their objectivity or independence of judgment.

The record plaintiff presented to the Law Division included a copy of the Mayor's Civic Association's 2014 tax returns, which showed it was registered with the Internal Revenue Service as a tax exempt organization. The list of officers and directors obtained from the New Jersey Business Entity and Records Service lists Grullon, the Board's Vice-Chairman, as Vice-President of the Association and Board member Gutierrez as the Association's CEO. The Board's Secretary is listed as one of the Association's Directors.

The Law Division Judge minimized the Association's activities and influence as involving merely "the donation of turkey baskets or candies for seniors." The filed tax returns of the Association for 2014 indicate it received contributions totaling $660,419 and spent $673,253, leaving a net deficit of $12,834. This document also shows the Association's contributions for 2013 totaled $557,402, with expenditures of $546,429, leaving a net positive balance of $10,973. The first page for the Association's tax returns for 2012 shows contributions totaling $500,619, and expenditures of $500,257, leaving a net positive balance of $362; the first page of the returns for 2011 shows contributions totaling $477,512, and expenditures of $477,065, leaving a net positive balance of $447; the tax returns for 2011 also show contributions

24

received in 2010 totaling $477,070, and expenditures for that same year of $490,157, leaving a net deficit of $13,087.

It is well-settled that hearings conducted before a zoning board of adjustment to decide an application for a land use approval are quasi-judicial proceedings. Dolan v. DeCapua, 16 N.J. 599, 612 (1954). Zoning boards must make factual determinations based on the record developed before them and decide whether the applicant has satisfied the statutory criteria for variances. Baghdikian v. Board of Adjustment of Ramsey, 247 N.J. Super. 45, 49 (App. Div. 1991). Its powers include the "judicial" role of deciding questions of credibility and whether to accept or reject testimony, expert or otherwise. Griggs v. Zoning Bd. of Adjustment of Princeton, 75 N.J. Super. 438, 446 (App. Div. 1962). Although our Supreme Court has recognized that based on their familiarity of their community's characteristics and interests, zoning boards' members are "best equipped to pass initially on such applications for variance." Ward v. Scott, 16 N.J. 16, 23 (1954), they may not rely on undisclosed facts that are not part of the record. Gougeon v. Board of Adjustment of Stone Harbor, 52 N.J. 212, 221 (1968).

As the Court made clear in Piscitelli, "common law conflict-of-interest principles inform our understanding of the Local Government Ethics Law and

the MLUL." 237 N.J. at 352. "A public official is disqualified from participating in judicial or quasi-judicial proceedings in which the official has a conflicting interest that may interfere with the impartial performance of his duties as a member of the public body." Scotch Plains-Fanwood Bd. of Educ. v. Syvertsen, 251 N.J. Super. 566, 568 (App. Div. 1991).

The tax return records of the Brian Stack Civic Association show that in the five-year period, from 2010 to 2014, it received contributions totaling $2,673,022 and disbursed $2,687,161. These records do not disclose the nature of the Association's activities. It is reasonable to presume, however, that these activities are intended and designed to promote the Mayor's interests. Even a cursory review of the limited financial information plaintiff gathered from public records shows that its activities may be far more expansive than "the donation of turkey baskets or candies for seniors." Board Vice-Chairman Grullon's role as the Association's Vice-President and Board member's Gutierrez's role as the Association's CEO requires a thorough, objective inquiry into whether these dual roles created a disqualifying conflict in this case. Piscitelli, 237 N.J. at 353.

The Law Division judge must review, consider, and determine whether the high level positions Grullon and Gutierrez had in the Mayor's Association at

the time plaintiff's application came before the Board, viewed in the context of the Mayor's aggressive opposition to plaintiff's application, constituted an indirect personal interest under N.J.S.A. 40:55D-69, precluding both of them from participating in this matter. The judge must also determine whether the Mayor's aggressive advocacy against the granting of plaintiff's application created reasonable grounds to establish a conflict of interest for Grullon and Gutierrez under N.J.S.A. 40A:9-22.2 and/or provided reasonable grounds under the common law for the public to doubt the impartiality of these two Board members. Finally, we leave it to the trial judge's discretion to determine whether plaintiff is entitled to discovery in the form of a limited number of written interrogatories and/or deposition testimony from Grullon and Gutierrez. In the words of Justice Albin in Piscitelli: "the ultimate goal is to ensure not only impartial justice but also public confidence in the integrity of the proceedings." 237 N.J. at 353.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0263-17T1